10-1918-cv(L)
Chevron Corp. v. Berlinger

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: July 14, 2010                    Decided: January 13, 2011)

Docket Nos. 10-1918-cv(L), 10-1966-cv(CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CHEVRON CORPORATION, RODRIGO PÉREZ PALLARES, RICARDO REIS VEIGA,

*Petitioners-Appellees*,

v.

JOSEPH A. BERLINGER, CRUDE PRODUCTIONS, LLC, MICHAEL BONFIGLIO, THIRD
EYE MOTION PICTURE COMPANY, INC., @RADICAL.MEDIA, LAGO AGRIO
PLAINTIFFS,

*Respondents-Appellants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:    LEVAL, B.D. PARKER, and HALL, *Circuit Judges*.

Appeal in a proceeding under 28 U.S.C. § 1782 from an order of the United States District Court for the Southern District of New York (Kaplan, *J.*) compelling disclosure for use in a suit in a foreign tribunal. Respondents, who directed and produced a documentary film about an environmental damage litigation being conducted in the courts of Ecuador, were directed by the district court to produce to petitioners, who are parties to Ecuadoran litigation, the videotape footage constituting the outtakes of their film. Respondents contend they are protected from such compelled disclosure by the qualified evidentiary privilege for information gathered during a journalistic investigation. The Court of Appeals (Leval, *J.*) affirms. Given the district court's findings about the circumstances of the making of the film, particularly the fact that the making of the film was

1

solicited by parties to the litigation to tell their story, and that changes to the film were made at the parties' instance, Berlinger failed to carry his burden of showing that he collected information for purposes of *independent* reporting and commentary.  Accordingly, it was within the district court's discretion to order the production.  AFFIRMED.

RANDY M. MASTRO, Gibson, Dunn & Crutcher LLP, *for* Petitioner-Appellee Chevron Corp.

ANDRÉS RIVERO, Rivero Mestre & Castro (Paul E. Dans, Jorge A. Mestre, *on the brief*), *for* Petitioner-Appellee Rodrigo Pérez Pallares.

BETH A. STEWART, Williams & Connolly LLP (Christopher N. Manner, *on the brief*), *for* Petitioner-Appellee Ricardo Reis Veiga.

MAURA J. WOGAN, Frankfurt Kurnit Klein & Selz, P.C. (Jessie F. Beeber, Nicole Hyland, Jeremy S. Goldman, *on the brief*), *for* Respondents-Appellants Joseph A. Berlinger, Crude Productions, LLC, Michael Bonfiglio, Third Eye Motion Picture Company, Inc., @radical.media.

ILANN M. MAAZEL, Emery Celli Brinckerhoff & Abady LLP (Jonathan S. Abady, O. Andrew F. Wilson, *on the brief*), *for* Respondents-Appellants Lago Agrio Plaintiffs.

Floyd Abrams, Cahill Gordon & Reindel LLP (Landis C. Best and Catherine Suvari, *on the brief*), *for Amici Curiae* ABC Inc., et al.

Rodney A. Smolla, Washington & Lee School of Law (John J. Walsh and Joshua E. Abraham, Carter Ledyard & Milburn LLP, *on the brief*), *for Amicus Curiae* Dole Food Co., Inc.

Michael C. Donaldson, Donaldson & Callif, LLP (Christopher L. Perez, *on the brief*), *for Amici Curiae* International Documentary Association, et al.

Richard D. Willstatter, Green & Willstatter (John D. Cline and K.C. Maxwell, *on the brief*), *for Amicus Curiae* National Association of Criminal Defense Lawyers.

LEVAL, *Circuit Judge*:

This is an appeal in a proceeding under 28 U.S.C. § 1782 from an order of the United States District Court for the Southern District of New York (Kaplan, *J.*) compelling disclosure for use in proceedings in foreign tribunals. The appeal involves the application of the qualified evidentiary privilege for information gathered during a journalistic investigation, sometimes described as the "press privilege" or "journalist's privilege."

The appeal is brought by Joseph Berlinger, a respondent in the § 1782 proceeding. Berlinger created a documentary film, entitled *Crude*, about a litigation being conducted in the courts of Ecuador at Lago Agrio (the "Lago Agrio litigation") over allegations of environmental damage in Ecuador from petroleum exploration and extraction operations conducted by an affiliate of petitioner Chevron Corp. The district court directed Berlinger[1] to produce to the petitioners the videotape footage constituting the outtakes of the film.

Petitioners, who sought and obtained the contested order of disclosure, are: 1) Chevron, which is a defendant in the Lago Agrio litigation, as well as a plaintiff in an arbitration in the Hague against Ecuador protesting the Lago Agrio litigation, and 2) Rodrigo Pérez Pallares (Pérez) and

---

[1]The appealing respondents also include Berlinger's affiliated production companies that were involved in the production of *Crude*, which were similarly directed by the district court to make disclosure. Because the legal principles involved in this appeal apply equally and without differentiation to Berlinger and his affiliates, we refer in the remainder of this opinion only to Berlinger, with the understanding that the points made in our discussion apply equally to the other appellants.

3

Ricardo Reis Veiga (Reis), attorneys employed by Chevron, who are defendants in criminal proceedings in Ecuador based on their actions in connection with the environmental litigation. They sought the disclosure for use in those criminal proceedings.

Berlinger contends the district court abused its discretion in ordering production of the outtake footage. He argues that his investigative journalism recorded in the raw footage is protected from such compelled disclosure by the press privilege. He therefore asks that we overturn the district court's order.

We reject Berlinger's contention. Given all the circumstances of the making of the film, as reasonably found by the district court, particularly the fact that Berlinger's making of the film was solicited by the plaintiffs in the Lago Agrio litigation *for the purpose of telling their story*, and that changes to the film were made at their instance, Berlinger failed to carry his burden of showing that he collected information for the purpose of *independent* reporting and commentary. Accordingly, we cannot say it was error for the district court to conclude that petitioners had successfully overcome Berlinger's claim of privilege.

**BACKGROUND**

*A. Events Prior to the Initiation of Petitions Under § 1782*

The district court's opinion sets forth a concise summary of the facts relevant to the challenged order of disclosure, prior to the filing of these petitions. *See In re Chevron Corp.*, 709 F. Supp. 2d 283, 285-89 (S.D.N.Y. 2010). We quote from the district court's statement of facts verbatim (omitting citations).

*I. Background*

These applications arise in the context of three decades of oil exploration and

4

extraction in Ecuador by Texaco, Inc. ("Texaco"), which became a wholly-owned subsidiary of Chevron in 2001. The following is a brief summary of Texaco's activities in Ecuador and the nine-year litigation that ensued in [the courts of the Second Circuit].

*A. Texaco's Oil Operations in Ecuador*

In 1964, Texaco Petroleum Company ("TexPet"), a subsidiary of Texaco, began oil exploration and drilling in the Oriente region of eastern Ecuador. In the following year, TexPet started operating a petroleum concession for a consortium owned in equal shares by TexPet and Gulf Oil Corporation (the "Consortium"). The government of Ecuador ("GOE") thereafter obtained Gulf Oil's interest through its state-owned oil company, Petroecuador, and became the majority stakeholder in the Consortium in 1976. TexPet operated a trans-Ecuadorian oil pipeline and the Consortium's drilling activities until 1990, when Petroecuador assumed those functions. Two years later, TexPet relinquished all of its interests in the Consortium, leaving it owned entirely by Petroecuador.

*B. The* Aguinda *Action*

In 1993, a group of residents of the Oriente region of Ecuador brought a class action suit in [the U.S. District Court for the Southern District of New York] against Texaco arising from TexPet's operations in the Consortium. The complaint in the action, captioned *Aguinda v. Texaco*, alleged that "between 1964 and 1992 Texaco's oil operation activities polluted the rain forests and rivers in Ecuador." The plaintiffs sought billions of dollars in damages on a variety of theories, including negligence, strict liability, and equity to "redress contamination of the water supplies and environment."

*C. Settlement and Release Agreements*

While the *Aguinda* litigation was pending, TexPet entered into a 1995 settlement agreement with the GOE and Petroecuador (the "Settlement") whereby TexPet agreed to perform specified environmental remedial work in exchange for a release of claims by the GOE. The release, which covered TexPet, Texaco, and other

5

related companies, encompassed "all the Government's and Petroecuador's claims against the Releasees for Environmental Impact from the Operations of the Consortium, except for those related to the obligations contracted" under the Settlement, which were to be "released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador."

Three years later, the GOE entered into an agreement with TexPet (the "Final Release") according to which the GOE deemed the Settlement to have been "fully performed and concluded" and "proceede[ed] to release, absolve, and discharge" TexPet and related companies "from any liability and claims . . . for items related to the obligations assumed by TexPet" in the Settlement.

*D. Dismissal of the* Aguinda *Action*

In the meantime, Texaco worked in earnest to transfer the *Aguinda* action from [the U.S. District Court for the Southern District of New York] to the courts of Ecuador on the grounds of *forum non conveniens* and international comity. Texaco touted the ability of the Ecuadorian courts to "provide a fair and alternative forum" for the plaintiffs' claims. It argued also that the case did not belong in [the U.S. court] because the evidence and witnesses were predominantly in Ecuador. After nine years of litigation, [the U.S. district court] dismissed the case on *forum non conveniens* grounds in 2001. The Second Circuit affirmed the dismissal the following year.[2]

*II. Ecuadorian Litigation and Criminal Prosecutions*

*A. The Lago Agrio Litigation*

In 2003, following the dismissal of the *Aguinda* action, a group of Ecuadorians including "a substantial number of the *Aguinda* Plaintiffs" brought an action against ChevronTexaco in Lago Agrio, Ecuador (the "Lago Agrio Litigation").

---

[2]We conditioned our affirmance of the district court's dismissal on receipt of Texaco's representation that it would consent to personal jurisdiction in Ecuador and pay any judgment entered by Ecuador's courts. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470, 475 (2d Cir. 2002).

Plaintiffs asserted claims for, among other things, violations of an Ecuadorian environmental law enacted in 1999. The defendants contended that the law in effect impermissibly allowed plaintiffs to assert, as private attorneys-general, claims that belonged to the GOE but were released pursuant to the Settlement and Final Release. The GOE announced that it would receive ninety percent of any recovery.

The Lago Agrio court ordered a "global" assessment of damages to be conducted by a team of expert witnesses led by Richard Stalin Cabrera Vega, who was required to "perform his work in an impartial matter" and to "maintain strict independence with regard to the parties." Dr. Carlos Beristain, who was appointed to Cabrera's team of expert witnesses, contributed to Cabrera's damages assessment for cancer deaths by meeting in "focus groups" with inhabitants of the region allegedly polluted by Chevron. . . . Chevron maintains that Dr. Beristain failed to maintain "strict independence" with respect to counsel for the Lago Agrio plaintiffs.

*B. Criminal Prosecution of Pallares and Veiga*

The same year that the Lago Agrio Litigation was filed, the GOE filed a criminal complaint against two of Chevron's lawyers, petitioners Pallares and Veiga, and former GOE and Petroecuador officials, alleging that they had falsified public documents in connection with the Settlement and Final Release and had violated Ecuador's environmental laws.

In 2004, the Ecuadorian Prosecutor General began an investigation of the criminal charges. The District Prosecutor, however, found that "there [was] not sufficient evidence to pursue the case against . . . Mr. Ricardo Reis Veiga and Mr. Rodrigo Pérez Pallares, representatives of TexPet." The Ecuadorian Deputy Attorney General nevertheless explained in an email to plaintiffs' counsel in the Lago Agrio Litigation that the criminal prosecutions were a potential "way to nullify or undermine the value of the" Settlement and Final Release, though "evidence of criminal liability established by the Comptroller [General's] Office was rejected by the prosecutor."

*C. Plaintiffs' Counsel Solicits a Documentary Film*

7

In 2005, Steven Donziger, one of the lead counsel for the plaintiffs in the Lago Agrio Litigation, solicited award-winning producer and filmmaker Joseph Berlinger to create a documentary depicting the Lago Agrio Litigation from the perspective of his clients. Berlinger recounted that:

"During the summer of 2005, a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door. He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker *to tell his clients' story*." [emphasis added]

For the next three years, Berlinger shadowed the plaintiffs' lawyers and filmed "the events and people surrounding the trial," compiling six hundred hours of raw footage.

*D. President Correa Takes Office*

In 2006, while the Lago Agrio Litigation was pending, Rafael Vincente Correa Delgato was elected President of Ecuador on a platform of economic and social reform. . . .

A short time after President Correa took office, he issued a press release "urg[ing] the Office of the Prosecutor to permit the Prosecution of the Petroecuador officials who accepted the remediation carried out by Texaco." He thereafter appointed a new Prosecutor General, who decided that the criminal case against Pallares, Veiga, and former GOE officials should proceed.

In 2009, Correa became the first Ecuadorian president in thirty years to be elected to a second term. . . .

*E. The International Arbitration*

The year that President Correa was reelected, Chevron commenced an arbitration pursuant to the Bilateral Investment Treaty between the United States and Ecuador ("BIT") and United Nations Commission on International Trade Law ("UNCITRAL") rules (the "Arbitration"). Chevron there asserts that the GOE "abuse[d] the criminal justice system" in connection with the Lago Agrio Litigation and the criminal prosecutions and violated the BIT and the American Convention on

8

Civil Rights. It seeks, among other things, dismissal of the Lago Agrio Litigation and a declaration that it "has no liability or responsibility for environmental impact . . . arising out of the former Consortium that was jointly owned by TexPet and Ecuador."[3]

*III. Berlinger Releases* Crude

In 2009, Berlinger released his documentary, entitled *Crude*, which, according to its own press package, "captures the evidentiary phase of the Lago Agrio trial, including field inspections and the appointment of independent expert Richard Cabrera to assess the region." The film depicts also the environmental damage allegedly caused by TexPet and interviews with Ecuadorians dying of diseases perhaps caused by oil spills. Petitioners highlight the following scenes in connection with their applications.

*A. Plaintiffs' Counsel Meets with Expert Witness*

*Crude* contains footage of a number of meetings that took place in the Dureno community of the indigenous Cofan people. A version of *Crude* "streamed" over Netflix depicts one such meeting, at which Dr. Beristain, an expert who contributed to Cabrera's neutral damages assessment, is shown working directly with both the Cofan people and plaintiffs' counsel. *Berlinger, however, altered the scene at the direction of plaintiffs' counsel to conceal all images of Dr. Beristain before* Crude *was released on DVD. The interaction between plaintiffs' counsel and Dr. Beristain therefore does not appear in the final version of* Crude *sold on DVD in the United States.* [emphasis added]

*B. Plaintiff[s'] Counsel Interferes with Judicial Inspection*

In another scene of *Crude*, Donziger, one of plaintiffs' lead counsel,

---

[3]The Ecuadoran Republic filed a petition in the United States District Court for the Southern District of New York to enjoin the arbitration. The district court (Sand, *J.*) denied the petition. That decision is being appealed, separately from this appeal. *Republic of Ecuador v. Chevron Corp.*, No. 10-1020 (2d Cir., argued Aug. 5, 2010).

persuades an Ecuadorian judge, apparently in the presence of Chevron's lawyers and news media, to block the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination. Donziger describes his use of "pressure tactics" to influence the judge and concedes that "[t]his is something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty."

*C. Plaintiffs' Representatives Meet with the Ecuadorian Government*

In another scene, a representative of the plaintiffs informs Donziger that he had left the office of President Correa "after coordinating everything." Donziger declares, "Congratulations. We've achieved something very important in this case. . . . Now we are friends with the President." The film then offers a glimpse of a meeting between President Correa and plaintiffs' counsel that takes place on a helicopter. Later on, President Correa embraces Donziger and says, "Wonderful, keep it up!"

Donziger explains also that President Correa had called for criminal prosecutions to proceed against those who engineered the Settlement and Final Release. "Correa just said that anyone in the Ecuador government who approved the so-called remediation is now going to be subject to litigation in Ecuador. Those guys are shittin' in their pants right now."

*B. The Instant Petitions Under Section 1782*

Chevron, Pérez, and Reis filed these petitions on April 9, 2010, asking the district court to direct Berlinger to disclose all footage shot or acquired in the making of *Crude* for use by Chevron in the Lago Agrio litigation and the treaty arbitration, and for use by Pérez and Reis in the prosecutions brought against them in Ecuador. In support of their applications, they contended that, because Berlinger had free access to plaintiffs' counsel and shot footage when plaintiffs' counsel were in court chambers and dealing with the supposedly neutral court expert, the footage excluded

10

from the film would show improper influence by Plaintiffs' counsel on the court and the court's expert. The Lago Agrio plaintiffs moved to intervene in opposition and were permitted to do so. Upon consideration of the submissions of the parties, the district court granted the petitions, ordering disclosure of the outtakes. *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010).

As set out above, the district court found that Stephen Donziger, the legal adviser to the Lago Agrio plaintiffs, solicited Berlinger to produce *Crude* "*to tell his clients' story*." *Id.* at 287 (emphasis added). The court additionally found that Berlinger removed a scene from the final version of *Crude* at the request of the Lago Agrio plaintiffs. *Id.* at 289, 296-97. (Berlinger acknowledges editing the scene at the suggestion of the Lago Agrio plaintiffs, but he maintains he "retained complete editorial control" over the film and rejected other changes the Lago Agrio plaintiffs proposed. Berlinger Aff. ¶ 33.)

Turning to the merits of the applications, the court first determined that the statutory prerequisites for ordering discovery in aid of a foreign proceeding had been satisfied, and that the discretionary factors governing the availability of such discovery, *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-66 (2004), weighed in favor of granting the applications. The court then found that Chevron had demonstrated that the information in the footage was of likely relevance to significant issues in the Lago Agrio litigation, the treaty arbitration, and the criminal prosecutions of Pérez and Reis, and that the information was not reasonably obtainable from other sources. *In re Chevron Corp.*, 709 F. Supp. 2d at 295.

"Any interaction between plaintiffs' counsel and a supposedly neutral expert in the Lago Agrio Litigation," the court found, "would be relevant to whether the expert is independent and his

11

damages assessment reliable." *Id.* at 297. "Plaintiffs' counsel's interactions with the Ecuadorian judiciary and government officials . . . would be relevant to Chevron's Arbitration claims for denial of due process and violations of the Settlement and Release agreements and the BIT." *Id.* The court concluded there was considerable reason to believe that the footage contained information relevant to the Lago Agrio litigation, the treaty arbitration, and the criminal prosecutions of Pérez and Reis, "including whether plaintiffs' counsel improperly influenced expert witnesses and the [Government of Ecuador]." *Id.*

As for whether the information was available from other sources, the court reasoned that "the raw footage [Berlinger] compiled would be 'unimpeachably objective' evidence of any misconduct on the part of plaintiffs' counsel, expert witnesses, or the [Government of Ecuador]. Petitioners therefore have shown that the material they seek would not be reasonably obtainable from other sources." *Id.* at 298.

The court rejected Berlinger's argument that the more demanding standard for disclosure of confidential information collected during a journalistic investigation applied, because Berlinger did not carry his burden of showing that his sources reasonably expected him to maintain information in confidence. *Id.* at 295. It also rejected Berlinger's argument that Chevron's request for *all* the Crude footage was overbroad, because Berlinger had not provided any proposal for distinguishing between relevant and assertedly non-relevant material. *See id.* at 297.

The court's most pertinent conclusions for purposes of this appeal were to the effect that Berlinger failed to establish that in making the film he functioned with journalistic independence. Although the court did not *explicitly* state a finding that Berlinger lacked independence, it stressed

12

that (1) "Donziger in fact solicited Berlinger to create a documentary of the litigation from the perspective of his clients," and (2) "Berlinger concededly removed at least one scene from the final version of *Crude* at their direction." *Id.* The clear import of these findings is that Berlinger failed to establish that he did his research and made his film with independence from a subject of the film.

On the basis of these findings and conclusions, the court authorized subpoenas duces tecum directing the production of all footage related to *Crude* or the Lago Agrio litigation.

*C. Subsequent Proceedings*

Berlinger appealed and moved for a stay of the district court's order. On June 8, 2010, a motions panel of this court stayed enforcement of the order until otherwise ordered by the panel assigned to hear the merits of the appeal. *In re Chevron*, No. 10-1918(L) (2d Cir. June 8, 2010) (order).

Following oral argument, we directed Berlinger to "promptly turn over to the petitioners copies of all footage that does not appear in publicly released versions of *Crude* showing: (a) counsel for the plaintiffs in [the Lago Agrio litigation]; (b) private or court-appointed experts in that proceeding; or (c) current or former officials of the Government of Ecuador." *Chevron Corp. v. Berlinger*, No. 10-1918(L) (2d Cir. July 15, 2010) (order). We directed that "Material produced under this order shall be used by the petitioners solely for litigation, arbitration, or submission to official bodies, either local or international." *Id.* at 2. Our order noted that a further opinion would follow.

**DISCUSSION**

We review the district court's factual findings for clear error, and its order directing

13

production of the *Crude* footage for abuse of discretion. Fed. R. Civ. P. 52(a)(6); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995). Identification of the correct legal standard raises a pure question of law, as to which we exercise plenary review. *See In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000).

*A. Jurisdiction*

We briefly address our jurisdiction to review the district court's production order. A discovery order entered as an auxiliary part of a plenary suit claiming entitlement to relief on the merits is ordinarily not immediately appealable because it is not a final order and is thus not made appealable by 28 U.S.C. § 1291. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 377 (1981); *In re W.R. Grace & Company-Conn.*, 984 F.2d 587, 589 (2d Cir. 1993); *Barrick Group, Inc. v. Mosse*, 849 F.2d 70, 72 (2d Cir. 1988). In such circumstances courts have held that a discovery order is not immediately appealable unless the protesting party refuses to perform and is held in contempt. *United States v. Ryan*, 402 U.S. 530, 532 (1971); *Cobbledick v. United States*, 309 U.S. 323, 327-28 (1940); *In re Air Crash at Belle Harbor, N.Y. on November 12, 2001*, 490 F.3d 99, 104 (2d Cir. 2007). The contempt order is deemed final and immediately appealable, notwithstanding that the underlying suit remains unadjudicated.

The situation is different for an order granting or denying discovery that constitutes the final resolution of a petition to take discovery in aid of a foreign proceeding under 28 U.S.C. § 1782. Because such an order is the final adjudication of the § 1782 application, it is immediately appealable under § 1291, regardless of the fact that the suit in another tribunal, to which it relates, remains unadjudicated. *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993); *In re Letters Rogatory*

14

*Issued by Dir. of Inspection of Gov't of India*, 385 F.2d 1017, 1018 (2d Cir. 1967).  We therefore have jurisdiction to review the district court's order directing production of the *Crude* footage.

*B. Journalist's Privilege*

Berlinger contends the district court abused its discretion in rejecting his claim of press privilege and consequently ordering him to produce his outtakes.  We disagree.

This circuit has long recognized a qualified evidentiary privilege for information gathered in a journalistic investigation.  *See, e.g.*, *Gonzales v. NBC*, 194 F.3d 29 (2d Cir. 1999); *In re Petroleum Prods. Antitrust Litig.* (*Petroleum Prods.*), 680 F.2d 5, 7-8 (2d Cir. 1982); *Baker v. F & F Inv.*, 470 F.2d 778 (2d Cir. 1972).  The privilege for such information is intended to protect the public's interest in being informed by "a vigorous, aggressive *and independent* press," *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (emphasis added), by limiting the circumstances in which litigants may obtain access to press files through court-ordered discovery.  *See also Gonzales*, 194 F.3d at 33; *Baker*, 470 F.2d at 782.  The protection accorded by the privilege, although not absolute, *Branzburg v. Hayes*, 408 U.S. 665, 690-91 (1972); *id.* at 709-10 (Powell, J., concurring), is at its highest when the information sought to be protected was acquired by the journalist through a promise of confidentiality.  Forcing the press to breach a promise of confidentiality threatens its ability in the future to perform its public function by impairing its ability to acquire information for publication.  *Petroleum Prods.*, 680 F.2d at 7-8; *Baker*, 470 F.2d at 782.  But the privilege is not limited to circumstances where the sources of information have been promised confidentiality.  *Gonzales*, 194 F.3d at 35.  We have observed, even where there was no issue of betrayal of a promised confidence, that "wholesale exposure of press files to litigant scrutiny would burden the

15

press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties – particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation." *Id.* at 35. We have noted, furthermore, that unrestricted litigant access to press files would create socially wasteful incentives for press entities "to clean out files containing potentially valuable information lest they incur substantial costs" of subpoena compliance, and would risk "the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Id.*

A person need not be a credentialed reporter working for an established press entity to establish entitlement to the privilege. *See Branzburg*, 408 U.S. at 705; *von Bulow*, 811 F.2d at 144-45; *see also Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir. 1993). Nonetheless, in collecting the information in question, the person must have acted in the role we identified in *Baker*, *von Bulow*, and *Gonzales* as that favored by the public interest that motivates the privilege – the role of the *independent* press.

In *von Bulow* we upheld a denial of the press privilege to one who, *at the time she collected the information*, was doing so for different reasons (to help vindicate a person standing trial and "for [her] own peace of mind"), notwithstanding her *subsequent* development of an intention to publish writings based on the information she had acquired. In explaining our ruling, we said, "[T]he talisman invoking the journalist's privilege is intent to disseminate to the public at the time the gathering of information commences." 811 F.2d at 145. The purpose of that explanation was to distinguish between proper invocation of the privilege, where the purpose to disseminate the

16

information motivated the gathering of the information, from improper invocation, where the information was gathered for other reasons and the intent to publish arose only later. Because of our focus on the particular deficiency presented by that case, our description of the "talisman" of the press privilege focused on the *timing* of the intention to make public dissemination. At the same time, we spoke of the interest being protected as the public's interest in being informed by "a vigorous, aggressive *and independent* press." *Id.* at 144 (emphasis added); *see also N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 180 (2d Cir. 2006); *Gonzales v. NBC*, 194 F.3d at 33; *Baker*, 470 F.2d at 782. The issue of the independence of the journalistic process is crucial to the present case.

For determining the existence, or in any event the strength, of the press privilege, all forms of intention to publish or disseminate information are not on equal footing. While freedom of speech and of the press belongs to virtually anyone who intends to publish anything (with a few narrow exceptions), all those who intend to publish do not share an equal entitlement to the press privilege from compelled disclosure. Those who gather and publish information because they have been commissioned to publish in order to serve the objectives of others who have a stake in the subject of the reporting are not acting as an independent press. Those who do not retain independence as to what they will publish but are subservient to the objectives of others who have a stake in what will be published have either a weaker privilege or none at all.

This distinction is perhaps best understood through an illustrative example. Consider two persons, Smith and Jones, who separately undertake to investigate and write a book or article about a public figure in national politics. Smith undertakes to discover whatever she can through her investigations and to write a book that reflects whatever her investigations may show. Jones has

17

been hired or commissioned by the public figure to write a book extolling his virtues and rebutting his critics. Smith unquestionably presents a stronger claim of entitlement to the press privilege (which is not to say the privilege might not be overcome, depending on the circumstances). Jones, who was commissioned to write a book promoting a particular point of view regardless of what her investigations may reveal, either possesses no privilege at all or, if she possesses the privilege, holds one that is weaker and more easily overcome.[4]

The privilege is designed to support the press in its valuable public service of seeking out and revealing truthful information. An undertaking to publish matter in order to promote the interests of another, regardless of justification, does not serve the same public interest, regardless of whether the resultant work may prove to be one of high quality. It is not the policy of the law to exempt such undertakings from the obligation to produce information relevant to a dispute before a court of law.

Applying these principles here, we believe that the district court's findings adequately justified its denial of the press privilege. Although the court did not explicitly state a finding that Berlinger failed to show his independence, its findings that (1) Donziger "solicited Berlinger to create a documentary of the litigation from the perspective of his clients," and (2) "Berlinger concededly removed at least one scene from the final version of *Crude* at their direction," essentially assert that conclusion. It was reasonable for the court to conclude on the basis of these findings that Berlinger's claim of privilege was overcome.

Our ruling in no way passes judgment on the value of Berlinger's film. We rule merely that

---

[4]We do not suggest that a journalist loses or weakens her privilege merely because her publication reflects her previously held point of view. Consistency of point of view does not show lack of independence.

the district court's factual findings were not clearly erroneous, and that those findings justified a conclusion that, given all the circumstances, Chevron overcame his claim of entitlement to withhold the outtakes under the press privilege.[5]

Our ruling likewise does not imply that a journalist who has been solicited to investigate an issue and presents the story supporting the point of view of the entity that solicited her cannot establish the privilege. Without doubt, such a journalist can establish entitlement to the privilege by establishing the independence of her journalistic process, for example, through evidence of editorial and financial independence. But the burden is on the person who claims the privilege to show entitlement, and in this instance, Berlinger failed to persuade the district court that he undertook the task with independence.

Berlinger argues, citing *Gonzales*, 194 F.3d at 36, that the district court's order must be overturned because Chevron failed to establish that the *Crude* outtakes contain information of likely relevance to a significant issue in the foreign proceedings which is not reasonably available from other sources. He asserts that some of the information in the footage is plainly irrelevant to the foreign proceedings, and that some of it is available from other sources because film crews employed by Chevron filmed many of the proceedings he filmed.[6]

---

[5]Berlinger testified that, after Donziger solicited him to tell the Lago Agrio plaintiffs' story, he told Donziger that the film he produced would not be "an environmental and human rights advocacy film with a single point of view . . .; [that it would] not be a one-sided diatribe, but rather a film that would reveal the complexities of the Lago Agrio Litigation, with Chevron's many arguments well represented." The district court, however, was not obliged to credit this self-serving testimony, and did not do so. We cannot say the court's factfinding was clearly erroneous in this regard.

[6]Chevron apparently has commissioned a documentary that describes the Lago Agrio litigation from *its* point of view. *See* Brian Stelter, *When Chevron Hires Ex-Reporter to*

19

This argument, however, proceeds from the incorrect premise that our description in *Gonzales* of the showing necessary to overcome the privilege of an independent press entity would apply regardless of whether the press entity claiming the privilege's protections acted with independence. *Gonzales* said no such thing. Our statement that a civil litigant may obtain nonconfidential materials from "a nonparty press entity" if it establishes "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources," *id.*, described the showing necessary to overcome the privilege claimed for an independent press undertaking. In that case, NBC had secretly filmed footage of Louisiana police conducting traffic stops on a highway in order to determine whether the police were motivated by bias and engaged in racial profiling. The independence of NBC's investigation was unquestioned. In describing the history of the development of the privilege, we stressed that it is grounded in the "paramount public interest in the maintenance of a[n] . . . *independent* press." *Id.* at 33 (emphasis added). Because the fact of NBC's independence was uncontested, our discussion assumed that the press entity was acting with independence; we did not address the analysis that would control in the event that the independence of the subpoenaed press entity were questioned.

A person (or entity) that undertakes to publish commentary but fails to establish that its research and reporting were done with independence from the subject of the reporting either has no press privilege at all, or in any event, possesses a privilege that is weaker and more easily overcome. We need not decide in this case whether the consequence of the failure of the claimant of the privilege to establish independence means it has a weaker privilege or no privilege at all. It is

*Investigate Pollution, Chevron Looks Good*, N.Y. Times, May 11, 2009, at B5.

sufficient to rule that given Berlinger's failure to establish his independence from the Lago Agrio plaintiffs, the district court did not abuse its discretion in ordering the production notwithstanding Berlinger's claim that some of the footage was either irrelevant to the proceedings or could have been obtained from other sources.

Berlinger advances two additional arguments why we should overturn the district court's order. First, he argues that the district court erred in rejecting his claim that the persons who appear in *Crude* expected the unedited *Crude* footage to remain confidential. He contends that because his sources expected him to retain the unedited source footage in confidence, the district court ought to have applied the more demanding standard which applies to disclosure of confidential information. *See Petroleum Prods.*, 680 F.2d at 7.

We cannot say, however, that the district court committed clear error in rejecting Berlinger's contention. Although Berlinger testified conclusorily that participants in his film "trusted that I would not turn over the raw footage to Chevron to be used against them," he did not submit corroborative evidence that the persons filmed demanded that the footage of them be held in confidence. Berlinger Aff. ¶ 28. To the contrary, the standard release form Berlinger submitted to persons whom he filmed specified that "the filmmakers may use my Contribution in connection with the creation of a nonfiction production . . . which may be released . . . in any media now known or hereafter invented." On the basis of this record, the district court was entitled to find that Berlinger did not sustain his burden of demonstrating information was conveyed to him in confidence.

Berlinger further argues that even if the journalist's privilege was overcome as to some of the *Crude* footage, the district court's disclosure order was overbroad. He argues that, even if *some*

21

scenes in *Crude* contain relevant material, it does not follow that *all* of the footage is relevant. Berlinger asserts that the district court should have analyzed the film scene-by-scene, directing production of the source footage for only those scenes whose relevance, based on the publicly released version of the film, was apparent.

We reject this argument for two reasons. First, as we have explained, a district court enjoys greater discretion to order production of privileged material when the person asserting the press privilege fails to carry his burden of showing that he acted with journalistic independence. Second, Berlinger did not provide the district court with any proposal for distinguishing between relevant and assertedly non-relevant material. While in general it is desirable for a district court to tailor a production order to material likely to be relevant, the district court lacked any reliable means of doing so. The court is not obligated to undertake this burden without help from the party requesting the limitation.

We conclude that the district court's denial of the press privilege was adequately supported by its findings and conclusions, and, therefore, within the court's allowable discretion.

*C. Section 1782*

Berlinger contends that the district court's production order conflicted with 28 U.S.C. § 1782, the statute that authorizes U.S. courts to order discovery for use in foreign and international proceedings. His only substantial argument in this respect is that the treaty arbitration between Chevron and Ecuador is not "a proceeding in a foreign or international tribunal" within the meaning of § 1782. *See generally Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 257-58 (2004); *NBC v. Bear Stearns & Co.*, 165 F.3d 184, 188-91 (2d Cir. 1999).

22

We do not reach the argument. Whether or not Berlinger is correct, it is clear that the Lago Agrio litigation and the criminal prosecutions of Pérez and Reis are covered by the statute. These proceedings provided an adequate basis for the district court's production order.

**CONCLUSION**

We have considered Appellants' remaining arguments and find them to be without merit. We hereby vacate the stay order which we entered on June 8, 2010, and affirm in full the district court's ruling of May 10, 2010. The material produced under the district court's order shall be used by the petitioners solely for litigation, arbitration, or submission to official bodies, either local or international. The case is remanded to the district court for all purposes.