11-1150-cv(L)
Chevron v. Naranjo

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: September 16, 2011     Decided: January 26, 2012)

Docket Nos. 11-1150-cv(L) 11-1264-cv(CON)

CHEVRON CORPORATION,

*Plaintiff-Appellee*,

— v.—

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE, STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Appellants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, BEATRIZ MERCEDES GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA

PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITANDE YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANDE,

*Defendants.*[*]

B e f o r e:

POOLER, WESLEY, and LYNCH, *Circuit Judges*.

_____

Defendants-appellants – residents of the Ecuadorian Amazon and their American attorney – challenge a preliminary injunction issued by the district court that prohibited them from enforcing or preparing to enforce a potential Ecuadorian judgment against plaintiff-appellee anywhere outside of the Republic of Ecuador. Because New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. §§ 5301-5309, does not authorize affirmative relief of this kind, but only recognizes a defense available when a would-be judgment-creditor first attempts enforcement in New York, we VACATE the injunction and REMAND to the district court with instructions to DISMISS the plaintiff-appellee's complaint.

_____

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the listing of the parties above.

2

JAMES E. TYRRELL, JR. (Eric S. Westenberger, Jason W. Rockwell, John J. Zefutie, Brendan M. Walsh, Edward M. Yennock, Patton Boggs LLP, Newark, NJ; Julio C. Gomez, Gomez LLC, New York, NY; Carlos A. Zelaya, II, F. Gerald Maples, PA, New Orleans, LA, *on the brief*), Patton Boggs LLP, Newark, NJ, *for Defendants-Appellants Naranjo et. al.*

JOHN W. KEKER (Elliot R. Peters, Jan N. Little, Steven A. Hirsch, Matthew M. Werdegar, *on the brief*), Keker & Van Nest LLP, San Francisco, CA, *for Defendants-Appellants Steven R. Donziger and The Law Offices of Steven R. Donziger.*

RANDY M. MASTRO (Andrea E. Neuman, Irvine, CA; William E. Thomson, Los Angeles, CA; Scott A. Edelman, Los Angeles, CA, *on the brief*), Gibson, Dunn & Crutcher LLP, New York, NY, *for Plaintiff-Appellee*.

---

GERARD E. LYNCH, *Circuit Judge*:

This appeal represents the latest chapter in the ongoing litigation between plaintiff-appellee Chevron Corp. ("Chevron") and the defendants-appellants, elsewhere known as the Lago Agrio Plaintiffs ("LAPs" or "Ecuadorians") and their American attorney Steven Donziger. Chevron brought the present action in part under New York's Uniform Foreign Country Money-Judgments Recognition Act ("the Recognition Act"), N.Y. C.P.L.R. §§ 5301-5309, which allows judgment-creditors to enforce foreign judgments in New York courts, subject to several exceptions. Chevron, a potential judgment-debtor, sought a global anti-enforcement injunction against the LAPs and Donziger prohibiting the latter from attempting to enforce an allegedly fraudulent judgment entered by an Ecuadorian court against Chevron.

3

On March 7, 2011, the Southern District of New York (Kaplan, *J.*) granted the global injunction, which the defendants-appellants now challenge. Chevron Corp v. Donziger, 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ("Donziger"). In an earlier order, we vacated that injunction and stayed the district court's proceedings pending the present opinion. Chevron Corp. v. Naranjo, No. 11-1150-cv(L), 2011 WL 4375022 (2d Cir. Sept. 19, 2011). We conclude that the district court erred in construing the Recognition Act to grant putative judgment-debtors a cause of action to challenge foreign judgments before enforcement of those judgments is sought. Judgment-debtors can challenge a foreign judgment's validity under the Recognition Act only defensively, in response to an attempted enforcement – an effort that the defendants-appellees have not yet undertaken anywhere, and might never undertake in New York. Consistent with our earlier order, we therefore reverse the district court's decision, vacate the injunction, and remand to the district court with instructions to dismiss Chevron's declaratory judgment claim in its entirety.

## BACKGROUND

The story of the conflict between Chevron and residents of the Lago Agrio region of the Ecuadorian Amazon must be among the most extensively told in the history of the American federal judiciary.[1] We and other courts have previously described in detail the parties' underlying dispute, which concerns allegations that Chevron's predecessor extensively polluted the Lago Agrio region of Ecuador and claims that Chevron is liable

---

[1] An underinclusive Westlaw search for Chevron or Texaco & Ecuador & "Lago Agrio" yields fifty-six results, all of which deal directly with this litigation.

4

for the resulting damages.  See, e.g., Chevron Corp. v. Berlinger, 629 F.3d 297 (2d Cir. 2011) ("Berlinger"); Republic of Ecuador v. Chevron Corp., 638 F.3d 384 (2d Cir. 2011) ("Republic of Ecuador"); Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002); Jota v. Texaco, Inc. 157 F.3d 153 (2d Cir. 1998).  The merits of that dispute are not now before us.  We therefore summarize the details of the underlying conflict only where necessary.

I.    **Facts**

From 1964 through 1992, Texaco and its subsidiary, Texaco Petroleum, or TexPet[2] – with various partners, including the Ecuadorian government – engaged in oil extraction in the Lago Agrio region of the Ecuadorian Amazon.  Jota, 157 F.3d at 155.  In 1992, Texaco withdrew from the extraction efforts.  Aguinda, 303 F.3d at 473.  The next year, the LAPs filed suit in the Southern District of New York, alleging a variety of environmental, health, and other tort claims related to the extraction activities.[3]  The

_____

[2] TexPet was the corporate entity primarily involved in the Ecuadorian exploration. Chevron purchased Texaco and its subsidiaries in 2001. Chevron suggests that its presence in this suit, as opposed to that of Texaco and TexPet, is evidence of the LAPs' ulterior motives.  The district court has also stated that under the U.S. law of successor liability, "Chevron did not succeed to obligations of Texaco by merger." Donziger, 768 F. Supp. 2d at 600 n.40.  But the questions of whether U.S. or Ecuadorian law governs whether a successor-in-interest is liable for a predecessor's alleged environmental torts committed in Ecuador, and what that governing law has to say on the subject, are not before us.  We therefore express no opinion about them.

[3] One group of plaintiffs had filed their action in Texas state court, which was eventually removed to the Southern District of Texas.  Sequihua v. Texaco, Inc., 847 F. Supp. 61 (S.D. Tex. 1994).  That case was also dismissed under principles of international comity and forum non conveniens.  A separate group of litigants had already initiated proceedings in the S.D.N.Y.  See Aguinda, 945 F. Supp. 625 (S.D.N.Y. 1996).

5

district court (Rakoff, *J.*) dismissed the plaintiffs' claims on grounds of international comity and forum non conveniens, stating that the case had "everything to do with Ecuador, and nothing to do with the United States." Aguinda v. Texaco, Inc., 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001).[4]

We initially disagreed with the district court, requiring that Texaco make "a commitment . . . to submit to the jurisdiction of the Ecuadorian courts" before a forum non conveniens dismissal was appropriate. Jota, 157 F.3d at 159; see also Aguinda, 303 F.3d at 475. After several more years of legal wrangling, Texaco accepted the condition established by this Court, but reserved, in its words, "its right to contest [the] validity [of an Ecuadorian judgment] only in the limited circumstances permitted by New York's Recognition of Foreign Country Judgments Act."

In 1994, while the litigation was ongoing in the Southern District of New York, Texaco entered into a settlement with the Ecuadorian government and its government-owned oil company, Petroecuador ("the GOE settlement"). Under the settlement, as Chevron has previously characterized it before this Court, "TexPet funded certain environmental remediation projects in exchange for . . . a release from liability for environmental impact falling outside the scope of that settlement." Republic of Ecuador, 638 F.3d at 390. The settlement was finalized in 1998, after Chevron – which had

---

[4] The district court also dismissed for failure to join the Government of Ecuador ("GOE") and Petroecuador, the GOE's wholly owned oil company, as indispensable parties. See Aguinda, 945 F. Supp. at 627.

6

acquired Texaco in 2001, see Berlinger, 629 F.3d at 300 – spent roughly $40 million on the remediation. Ecuador and Chevron continue to litigate the validity and effect of the settlement before a Bilateral Investment Treaty arbitration panel. See Republic of Ecuador, 638 F.3d at 390.

After the dismissal of the New York action, the LAPs initiated a lawsuit against Chevron in Ecuador, the GOE settlement notwithstanding. After seven years of litigation, on February 14, 2011, the trial court issued its decision, finding Chevron liable for $8.6 billion of damages, with a $8.6 billion punitive damages award to be added unless Chevron apologized within fourteen days of the opinion's issuance. Chevron did not apologize; the pending judgment is thus for $17.2 billion.

Chevron alleges that the LAPs and their lawyers pursued that litigation by a variety of unethical, corrupt, and illegal means, including exercising undue influence in the process by which the Ecuadorian court selected Richard Cabrera Vega, its designated independent expert,[5] and by controlling the subsequent production of Cabrera's supposedly neutral damages assessment. In re Application of Chevron Corp., 709 F. Supp. 2d 283, 289 (S.D.N.Y. 2010) ("Chevron I"). Chevron also alleges that Donziger engaged in other threats against the Ecuadorian judiciary, by mobilizing protesters to intimidate the court by surrounding it on the dates of key hearings, and by enlisting political pressure from elected officials, including the President of Ecuador.

---

[5] The district court credited Chevron's allegation that Donziger threatened to blackmail the Ecuadorian judge who was "on his heels from charges of trading jobs for sex in the court." Donziger, 768 F. Supp. 2d at 606 (internal alterations omitted).

In 2005, Donziger contacted Joseph Berlinger, a prominent New York documentary filmmaker, and solicited him to make a film "to tell his clients' story." See Berlinger, 629 F.3d at 302-03. Berlinger agreed, and the documentary he eventually produced, *Crude: The Real Price of Oil,* is presented as an insider's account of the entire epic, including details of the plaintiffs' various legal and political strategies in Ecuador, principally from Donziger's own unfiltered point of view. The version of *Crude* initially released in the United States, available for online streaming from Netflix, included footage suggesting that Cabrera, the purportedly independent expert, worked hand-in-glove with the plaintiffs in his investigations. Berlinger, 629 F.3d at 303-04. After Donziger discovered that footage, he insisted that Berlinger remove it from the version of the film given theatrical release. Berlinger complied, but not before Chevron had seen, on Netflix, the scenes in question.

After discovering that footage, Chevron launched dozens of discovery proceedings pursuant to 28 U.S.C. § 1782 throughout the United States,[6] an effort the Third Circuit aptly characterized as "unique in the annals of American judicial history." In re Chevron Corp., 650 F.3d 276, 282 n. 7 (3d Cir. 2011). Through these proceedings – which have resulted in at least fifty orders and opinions from federal courts across the country –

_____

[6] 28 U.S.C. § 1782 allows a party to a foreign or international litigation – or the foreign or international tribunal itself – to compel a person in the "district in which [the] person resides or is found . . . to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal[.]" Id. § 1782(a).

Chevron gained access to an extraordinary quantity of material, including all of Donziger's litigation files.[7] Chevron successfully argued that the material it sought in these proceedings was not protected by attorney-client privilege, whether because the privilege had never attached, see id. at 289; or because it was waived, In re Chevron Corp., 633 F.3d 153, 156 (3d Cir. 2011). When this Court held that Berlinger was not entitled to the "qualified evidentiary privilege for information gathered in a journalistic investigation," Berlinger, 629 F.3d at 306, Chevron also gained access to over six hundred hours of *Crude* outtakes.

The outtakes contained Donziger's unedited characterizations of, inter alia, his negative view of the Ecuadorian judiciary; the LAPs' litigation, legislative, and political strategies; and how the LAPs planned to use any resulting Ecuadorian judgment to force a quick settlement with Chevron. See Berlinger, 629 F.3d at 303-06 (reciting verbatim the district court's findings of fact in Chevron I, 709 F. Supp. 2d at 285-89). Chevron also discovered in Donziger's litigation files a memo, entitled "Invictus," written by the LAPs' attorneys at Patton Boggs LLP. The undated memo details a proposed enforcement strategy, including enforcement in multiple jurisdictions and efforts to use judgment enforcement for settlement leverage, for the plaintiffs to undertake in the event they prevail before the Ecuadorian courts.

---

[7] These proceedings are ongoing. See Republic of Ecuador v. Bjorkman, No. 11-cv-01470-WYD-MEH, 2011 WL 5439681 (D. Colo. Nov. 9, 2011) (the most recent order issued under Section 1782 initiated by Chevron).

On the basis of these and other materials, Chevron alleges that the Ecuadorian judgment is fundamentally tainted by fraud. The heart of the alleged fraud is two-fold. First, Chevron accuses Donziger and his team of covert illicit participation in the selection of Cabrera – the putative independent expert – and, eventually, of ghost-writing Cabrera's entire report. Second, Chevron accuses Donziger of wresting control of the Ecuadorian judicial process by political pressure in order to obtain a judgment based on political advantage rather than the rule of law.

Chevron presented its alleged evidence of fraud to the Ecuadorian trial court, eventually convincing it to dismiss the Cabrera report's interpretations – but not its data – from the trial court's final decision. Nevertheless, as noted above, the Ecuadorian court returned a judgment against Chevron, rejecting Chevron's claim of potential intimidation and concluding, in a 188-page opinion containing extensive findings of fact and detailed conclusions of law, that Chevron was liable for widespread environmental degradation in the Lago Agrio region.

Both parties appealed the trial court's decision to an intermediate court. That appeal was pending through the issuance of the district court's injunction and for most of the period that this appeal was under consideration. The intermediate court upheld the trial court's judgment on January 3, 2012. Under Ecuadorian law, as characterized by Chevron's expert, the intermediate court based its ruling "on the merit of the record." *Código de Procedimiento Civil*, art. 838 (Ecuador, 2005). The LAPs assert, and Chevron does not dispute, that this standard of review is similar to the American standard of de

10

novo review, and is applicable to questions both of fact and of law. According to Chevron's expert on Ecuadorian law, the Ecuadorian judgment remained unenforceable until the intermediate court issued its decision. Now that this opinion has issued, Chevron retains its ability to appeal the intermediate court's decision to the National Court of Justice, Ecuador's highest court, which will review only questions of law. The intermediate court can stay any judgment pending final appeal, subject to Chevron's posting of a bond, the value of which is determined by the intermediate court.

## II.    **District Court Proceedings**

Chevron filed its complaint on February 1, 2011. The original complaint asserted claims of racketeering, extortion under both federal and state law, mail fraud, wire fraud, money laundering, obstruction of justice, witness tampering, conspiracy to violate racketeering laws, tortious interference with contract, unjust enrichment, civil conspiracy, and trespass to chattels. In addition to money damages, Chevron sought a permanent injunction under the Declaratory Judgment Act and the Recognition Act barring the enforcement, anywhere in the world outside of Ecuador, of any judgment rendered against it by the Ecuadorian courts. On April 15, 2011, the district court severed the declaratory judgment claim from the others in order to expedite the trial that would determine the validity of the putative Ecuadorian judgment. Chevron Corp. v. Donziger, 800 F. Supp. 2d 484 (S.D.N.Y. 2011) ("Donziger II").[8]

---

[8] We decide only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon.

11

Chevron argues that the Ecuadorian judiciary is so captured by political interests as to be incapable of producing a judgment that the New York courts can enforce. In making this argument, Chevron relies almost exclusively on the declaration of Dr. Vladimiro Álvarez Grau, a lawyer, academic, politician, and editorialist from Quito, and, according to the Republic of Ecuador, also an avowed political opponent of the country's current President, Rafael Correa.[9] Br. for Republic of Ecuador as Amicus Curiae Supporting Defendants-Appellants at 18 ("Ecuador Br."). In that declaration, Dr. Álvarez avers that the judicial system in Ecuador, never strong, has been significantly weakened by the policies of the Correa administration. Donziger, 768 F. Supp. 2d at 617-19. The Ecuadorian government disputes the content of this declaration, and alleges political bias by its author. Ecuador Br. at 18.

The district court was persuaded, however, and granted the injunction. In reaching its conclusion, the district court confirmed Chevron's theory of the judgment's invalidity and held that Chevron was, at a subsequent trial, either likely to prevail on the merits or at least had shown a sufficiently serious question going to the merits to justify a preliminary injunction. Specifically, the court concluded that Chevron was likely to show that the Ecuadorian court system is incapable of producing a judgment that New York courts can

---

[9] The district court also draws significant support from that report. While the district court refers to Donziger's disparaging remarks about the independence and corruptibility of the Ecuadorian judiciary as a kind of corroborating testimony, see Donziger, 768 F. Supp. 2d at 620, the most important evidence supporting its conclusion that the Ecuadorian judicial system has become incapable of producing a judgment enforceable in New York courts since the election of President Correa comes from the Álvarez report, and the opinions of other experts quoted therein. See id. 616-20.

12

respect, under the Recognition Act, as "the Ecuadorian judicial system 'no longer acts impartially, with integrity and firmness in applying the law and administering justice,'" Donziger, 768 F. Supp. 2d at 633-34 (quoting the Álvarez report), and that the system "has been plagued by corruption and political interference for decades, and the situation has worsened since President Correa's election," see id. at 634. Furthermore, the district court held that there was "ample evidence of fraud in the Ecuadorian proceedings," id. at 636, and that such evidence was sufficiently serious to warrant a preliminary injunction.[10]

## DISCUSSION

On appeal, Donziger and the LAPs make roughly a dozen arguments, many of them unique to one or the other. We decide first an issue central to all appellants: whether Chevron's theory of the Recognition Act supports the injunction it seeks. Finding that it does not, we dismiss the present claim in its entirety and therefore need not reach the appellants' remaining arguments, each of which is rendered moot by the dismissal of this complaint.[11]

---

[10] The injunction itself "enjoined and restrained" the defendants from "directly or indirectly funding, commencing, prosecuting, advancing in any way, or receiving benefit from any action or proceeding, outside the Republic of Ecuador, for recognition or enforcement of the judgment previously rendered in [the *Lago Agrio Case*]. . . , or any other judgment that hereafter may be rendered in the *Lago Agrio Case* by that court or by any other court in Ecuador in or by reason of the *Lago Agrio Case* (collectively, a 'Judgment'), or for prejudgment seizure or attachment of assets, outside the Republic of Ecuador, based upon a Judgment." Donziger, 768 F. Supp. 2d at 660.

[11] After the district court issued its injunction, Donziger and the LAPs filed a petition for a writ of mandamus asking this Court to order Judge Kaplan's removal from the case. We consolidated that petition with the present appeal, and denied the mandamus

13

I.      **Preliminary injunction**

As Judge Friendly explained, "Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge whose decisions will be reversed only for 'abuse,' a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law." Donovan v. Bierwirth, 680 F.2d 263, 269 (2d Cir. 1982). Thus, a district court commits reversible error in awarding a preliminary injunction not only by misapplying the standard governing their provision – that a party must show irreparable harm, likelihood of success on the merits, and so forth, see UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011) – but also if the district court's ruling "misapprehend[s] the law." Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir. 1996). We review questions of law in the context of a preliminary injunction de novo, County of Nassau, N.Y. v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008), and conclude that the district court's endorsement of Chevron's theory of relief is such a legal misapprehension.

---

petition without opinion. See Chevron Corp. v. Naranjo, No. 11-1150-cv(L), 2011 WL 4375022 (2d Cir. 2011) (expressly limiting the present opinion to the declaratory judgment actions). The appellants also ask, separately, for a reassignment on remand. In light of the severance of Chevron's claim under the Recognition Act, our resolution of the present appeal completely disposes of the underlying action, leaving nothing further to be addressed on remand with respect to the severed claim, notwithstanding the continuation of separate proceedings between these parties on other causes of action before the same district court judge.

14

## A. The Recognition Act

"New York has traditionally been a generous forum in which to enforce judgments for money damages rendered by foreign courts, and, in accordance with that tradition, the State adopted the Uniform Foreign Money-Judgments Recognition Act as CPLR article 53." See Galliano, S.A. v. Stallion, Inc., 15 N.Y.3d 75, 79-80 (2010) (internal quotation marks). The Recognition Act supports the enforcement of foreign judgments that are "final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal." N.Y. C.P.L.R. § 5302. There are ten exceptions to that presumption of enforceability, two of which mandate nonrecognition, the other eight leaving the question of nonrecognition to the court's discretion. Id. § 5304; see also Thomas & Agnes Carvel Found. v. Carvel, 736 F. Supp. 2d 730, 743 (S.D.N.Y. 2010). One of the mandatory exceptions requires that a court not enforce a judgment if "the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." N.Y. C.P.L.R. § 5304(a)(1). The court may also decline recognition if, inter alia, "the judgment was obtained by fraud." Id. § 5304(b)(3).

Chevron bases its preemptive, global anti-enforcement effort on three arguments: (1) that the judgment was fraudulently procured, in violation of N.Y. C.P.L.R. § 5304(b)(3); (2) that Ecuador lacks impartial tribunals, in violation of N.Y. C.P.L.R. § 5304(a)(1); and (3) that domestic and international due process were violated in procuring the judgment, in violation of N.Y. C.P.L.R. § 5304(a)(1).

15

Whatever the merits of Chevron's complaints about the Ecuadorian courts, however, the procedural device it has chosen to present those claims is simply unavailable: The Recognition Act nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor. The structure of the Act is clear. The sections on which Chevron relies provide *exceptions* from the circumstances in which a holder of a foreign judgment can obtain enforcement of that judgment in New York; they do not create an affirmative cause of action to declare foreign judgments void and enjoin their enforcement.

Previous experience with the Recognition Act and similar statutes in other jurisdictions supports this conclusion: nearly every court to analyze these exceptions has done so only when the judgment-debtor raised them as affirmative defenses.[12] Our research has discovered only one out-of-circuit district court case that has allowed a judgment-debtor to use the Recognition Act to make such a preemptive declaration. See Shell Oil Co. v. Franco, No. CV 03-8846 NM, 2005 WL 6184247 (C.D. Cal. Nov. 10, 2005). In Shell, the Central District of California concluded that the plaintiff-judgment-debtor's preemptive maneuver was appropriate because the judgment-creditor had already sought enforcement of its Nicaraguan judgment in California, but had failed to name a

---

[12] See Osorio v. Dole Food Co., 665 F. Supp. 2d 1307 (S.D. Fla. 2009) (Nicaragua); Kensington Int'l Ltd. v. Republic of Congo, 461 F.3d 238 (2d Cir. 2006) (Congo); Soc'y of Lloyd's v. Ashenden, 233 F.3d 473 (7th Cir. 2000) (England); Bridgeway Corp v. Citibank, 45 F. Supp. 2d 276 (S.D.N.Y. 1999) (Liberia); S.C. Chimexim S.A. v. Velco Enters. Ltd., 36 F. Supp. 2d 206 (S.D.N.Y. 1999) (Romania); Bank Melli Iran v. Pahlavi, 58 F.3d 1406 (9th Cir. 1995) (Iran); Ackermann v. Levine, 788 F.2d 830 (2d Cir. 1986) (West Germany).

16

defendant who was party to the foreign judgment – the plaintiffs sued Shell Chemical

Company, and not Shell Oil Company, which are distinct legal entities.[13] After the court

dismissed the enforcement action against Shell Chemical, Shell Oil preemptively sued for

a declaration of nonrecognition of the foreign judgment. The district court granted the

injunction, deeming the plaintiffs' first failed attempt at enforcement sufficient to trigger

the nonrecognition exceptions of California's Recognition Act. Id. at *4. Shell is

distinguishable from the case at hand because the plaintiffs here have made no effort to

enforce their judgment in New York (nor, indeed, in any other jurisdiction).[14]

Furthermore, to the extent that Shell stands for the proposition that the

Recognition Act can be used by judgment-debtors as a procedural lever to seek

affirmative invalidation of foreign judgments before their enforcement is sought, we

decline to follow it. Challenges to the validity of foreign judgments under the

_____

[13] For the earlier action, see Franco v. Dow Chem. Co., No. CV 03-5094 NM, 2003 WL 24288299 (C.D. Cal. Oct. 20, 2003).

[14] Although Chevron includes Shell in several string cites, it neither discusses the case's facts nor notes the procedural differences between it and the present dispute. Chevron does cite Younis Bros. & Co. v. Cigna Worldwide Ins. Co., 167 F. Supp. 2d 743, 747 (E.D. Pa. 2001), claiming that the court in that case issued a "worldwide injunction prohibiting judgment-creditor 'from taking any action to enforce [the Liberian judgment] in any jurisdiction.'" Appellee's Br. 37 (citing Younis Bros. 167 F. Supp. 2d at 747). This is a misleading characterization of the case. Younis Bros. held that a plaintiff who had previously *failed* in an effort to secure a judgment on an insurance policy for losses suffered in Liberia could not retry the case in foreign jurisdictions that refused to recognize the res judicata effects of the court's previous decision. The defendant in that case returned to the jurisdiction where the plaintiff had previously lost, and secured an anti-suit injunction that precluded the plaintiff from attempting to secure a judgment on the same facts, contra the previously failed effort. Younis Bros. 167 F. Supp. 2d at 747.

17

Recognition Act can occur only after a bona fide judgment-creditor seeks enforcement in an "action on the judgment, a motion for summary judgment in lieu of complaint, or in a pending action by counterclaim, cross-claim or affirmative defense," and not before. See N.Y. C.L.P.R. § 5303.

These procedural requirements exist for good reason. The Recognition Act and the common-law principles it encapsulates are motivated by an interest to *provide for* the enforcement of foreign judgments, not to prevent them. The Act "was designed to promote the efficient enforcement of New York judgments abroad by assuring foreign jurisdictions that their judgments would receive streamlined enforcement" in New York. CIBC Mellon Trust Co. v. Mora Hotel Corp. N.V. 100 N.Y.2d 215, 221 (2003) (citation omitted). See also Arthur T. von Mehren & Donald T. Trautman, *Recognition of Foreign Adjudications: A Survey and a Suggested Approach*, 81 Harv. L. Rev. 1601, 1602-03 (1968) (describing the purpose of "fostering the elements of stability and unity essential to an international order" through the enforcement of foreign judgments). The exceptions to that rule – such as the mandatory nonrecognition of judgments procured without due process or personal jurisdiction – serve the same purpose: to facilitate trust among nations and their judicial systems by preventing one jurisdiction from using the trappings of sovereignty to engage in a sort of seignorage by which easy judgments are minted and sold to any plaintiff willing to pay for them. Accordingly, a jurisdiction such as New York that requires foreign judgments to comport with certain basic requirements of fairness and legitimacy instills trust in the overall enforcement-facilitation framework.

18

Chevron would turn that framework on its head and render a law designed to facilitate "generous" judgment enforcement into a regime by which such enforcement could be preemptively avoided. Galliano, 15 N.Y.3d at 80. It is not enough to allege, as Chevron does at great length, that Ecuadorian courts in general and the Ecuadorian provincial court in particular are precisely the kind of tribunals that the Act's exceptions seek to preclude from issuing recognizable foreign judgments. If such is the case – a question on which we offer no opinion – Chevron will have its opportunity to challenge the judgment's enforcement under this Act at such time, if any, as judgment-creditors seek to enforce the judgment in New York.[15]

That the Ecuadorian judgment is now, in light of the Ecuadorian intermediate court's January 2012 ruling, potentially "final, conclusive and enforceable where rendered" makes Chevron's theory of relief no more consistent with New York law.[16]

---

[15] Indeed, the burden may be on the would-be judgment-creditors themselves to establish that the judgment was *not* the procured from an inadequate judicial system. See Ackermann, 788 F.2d at 842 n.12 (finding that the plaintiff in a foreign enforcement action bears the burden to prove that the mandatory exceptions do not apply, after which the defendant bears the burden to show why the court should exercise its discretion under the nonmandatory factors to find nonrecognition); Shen v. Leo A. Daly Co., 222 F.3d 472, 476 (8th Cir. 2000) (holding that "the party arguing that the [foreign] judgment should be given preclusive effect[] must establish each of the[] factors."). But see Osorio, 665 F. Supp. 2d at 1324 (holding that the plaintiff must show only that the judgment was final, conclusive, and enforceable where rendered, and, if the plaintiff does so, the "burden . . . shifts to Defendants to establish one or more grounds for nonrecognition").

[16] The LAPs seem to argue that because the Ecuadorian intermediate appellate court had not yet issued its opinion at the time the district court issued its injunction, and that the Ecuadorian trial court's decision was thus not final, conclusive, or enforceable where rendered, the case is unripe for adjudication under the U.S. Constitution's "case or controversy" requirement. U.S. Const. Art. III, § 2 cl. 1. We have jurisdiction, however,

19

N.Y. C.P.L.R. § 5302. The existence of such an enforceable judgment is a *necessary* condition that must precede the invocation of the Recognition Act; it is not, as we have just explained, a sufficient condition. There is thus no legal basis for the injunction that Chevron seeks, and, on these facts, there will be no such basis until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law.

### B. International Comity Concerns

Considerations of international comity provide additional reasons to conclude that the Recognition Act cannot support the broad injunctive remedy granted by the district court. As noted above, the New York legislature, in enacting the Recognition Act, sought to provide a ready means for foreign judgment-creditors to secure routine enforcement of their rights in the New York courts, while reserving New York's right to decline to participate in the enforcement of fraudulent "judgments" obtained in corrupt legal

for two reasons. Most obviously, the Ecuadorian intermediate court has now released its opinion; the decision may now be enforceable, subject to the procedural requirements identified earlier. Second, at the time the appeal was first taken, the question whether the judgment was unenforceable outside of Ecuador was disputed: Chevron insisted, at oral argument, that a treaty between Ecuador and certain other Latin American countries would permit even the trial court's preliminary judgment to serve as a sufficient basis for the attachment of Chevron's assets outside of Ecuador. Chevron's expert on Ecuadorian law, in his affidavit before the district court, suggests that the unnamed treaty may be the Inter-American Convention on the Execution of Preventive Measures, which – according to Chevron's expert – might allow the LAPs "to secure attachment and/or freezing of assets in Ecuador and other jurisdictions which may recognize and enforce Ecuadorian preventive measures, such as Colombia." Regardless of whether Chevron's theory of the laws of Latin American judgment enforcement is correct, the controversy on this very point is sufficient for a finding of ripeness under Article III.

systems whose courts failed to provide the basic rudiments of fair adjudication. In doing so, New York undertook to act as a responsible participant in an international system of justice – not to set up its courts as a transnational arbiter to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs. The exceptions to New York's general policy of enforcing foreign judgments are exactly that: exceptions that permit New York courts, under specified circumstances, to decline efforts to take advantage of New York's policy of liberally enforcing such judgments. Nothing in the language, history, or purposes of the Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions about the enforceability of such judgments.

The parties thus appropriately devote considerable attention to the implications of the district court's injunction for international comity. See Donziger, 768 F. Supp. 2d at 646-48. But the central focus of their discussion is not the international comity concerns associated with the Recognition Act, but the extent to which our test articulated in China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987), guides the analysis. Before enjoining foreign litigation, China Trade and its progeny require that two threshold requirements be met: "(A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs.,

21

Inc., 369 F.3d 645, 652 (2d Cir. 2004) (citing China Trade, 837 F.2d at 36).  If those threshold requirements are met, "courts are directed to consider a number of additional factors," id., including whether the parallel litigation would: "(1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment," Karaha Bodas Co. v Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 500 F.3d 111, 119 (2d Cir. 2007) (alterations omitted).

The China Trade balancing test has limited relevance here.  China Trade and its progeny deal with anti-foreign-suit injunctions, which bear at most a passing resemblance to the injunction that Chevron seeks.  China Trade anti-suit injunctions are imposed where the same parties attempt to litigate the same underlying dispute in multiple fora, often in a so-called "race for res judicata."  Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 432 (S.D.N.Y. 2002); see also Karaha Bodas Co., 500 F.3d at 117 (affirming an injunction against Indonesia, which had attempted to challenge the factual validity of a Swiss arbitral award confirmed in federal courts through litigation in the Cayman Islands).

Although both sides have characterized the district court's injunction as an "anti-suit injunction" to be assessed according to the standards set out in China Trade, it is, in reality, an *anti-enforcement* injunction, and is therefore not governed by those standards. Chevron's declaratory action and the underlying litigation in Ecuador encompass two

22

distinct disputes.  In Ecuador, the parties continue to litigate the extent to which Chevron's predecessor polluted Lago Agrio, and whether the company is liable for the resulting damages.  In the case before us, Chevron seeks to preemptively declare invalid the judgment that Ecuador's courts may ultimately issue in that previous litigation.  The two actions are not only separate, but sequential.  The factors discussed in China Trade therefore do not apply; the appropriate analytical framework is the one imposed by the Recognition Act.

This does not mean that international comity is not relevant to the disposition of this case.  A decision by a court in one jurisdiction, pursuant to a legislative enactment in that jurisdiction, to decline to enforce a judgment rendered in a foreign jurisdiction necessarily touches on international comity concerns.  It is a particularly weighty matter for a court in one country to declare that another country's legal system is so corrupt or unfair that its judgments are entitled to no respect from the courts of other nations.  That inquiry may be necessary, however, when a party seeks to invoke the authority of our courts to enforce a foreign judgment.

But when a court in one country attempts to preclude the courts of every other nation from ever considering the effect of that foreign judgment, the comity concerns become far graver.  In such an instance, the court risks disrespecting the legal system not only of the country in which the judgment was issued, but also those of other countries, who are inherently assumed insufficiently trustworthy to recognize what is asserted to be the extreme incapacity of the legal system from which the judgment emanates.  The court

23

presuming to issue such an injunction sets itself up as the definitive international arbiter of the fairness and integrity of the world's legal systems.

The district court opinion here nowhere addresses the legal rules that would govern the enforceability of an Ecuadorian judgment under the laws of France, Russia, Brazil, Singapore, Saudi Arabia or any of the scores of countries, with widely varying legal systems, in which the plaintiffs might undertake to enforce their judgment. Nor is it clear how a conclusion that the judgment may not be enforced in New York, based on analysis of a New York statute that undertakes to address nothing more than whether New York will recognize the judgment, could authorize a court sitting in New York to address the rules applicable in other countries, or to enjoin the plaintiffs from even presenting the issue to the courts of other countries for adjudication under their own laws. Nothing in the New York statute, or in any precedent interpreting it, authorizes a court to enjoin parties holding a judgment issued in one foreign country from attempting to enforce that judgment in yet another foreign country.

We need not address here whether and how international comity concerns would affect a hypothetical effort by a state to vest its courts with the authority to issue so radical an injunction. There is no such statutory authorization, for New York has authorized no such relief. To resolve the dispute before us, we need only address whether the statutory scheme announced by New York's Recognition Act allows the district court to declare the Ecuadorian judgment non-recognizable, or to enjoin plaintiffs from seeking

to enforce that judgment.  Because we find that it does not, the injunction collapses before we reach issues of international comity.

### C.   The Declaratory Judgment Act

Chevron implicitly acknowledges the Recognition Act's limitations by attempting to characterize its far-reaching claims as a simple declaratory judgment action under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ("DJA").  This argument misunderstands the purpose of the DJA.  The DJA gives a district court the discretion to "declare the legal rights and other legal relations of any interested party seeking such declaration."  Id. § 2201(a).  But that discretion does not extend to the declaration of rights that do not exist under law.  Like a preliminary injunction, a declaratory judgment relies on a valid legal predicate.  The DJA is "procedural only," Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950), and "does not create an independent cause of action," Davis v. United States, 499 F.3d 590, 594 (6th Cir. 2007).  See also Hanson v. Wyatt, 552 F.3d 1148, 1157 (10th Cir. 2008) (finding that the DJA "does not create substantive rights" (internal quotation marks omitted)); Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan, 617 F. Supp. 2d 131, 150-51 (E.D.N.Y. 2008); Dow Jones, 237 F. Supp. 2d at 420 (finding that the plaintiff's proposed use of the Act would "invest [it] with operation as a source of substantive rights – a purpose for which the statute was not envisioned").  Thus, where the Recognition Act does not provide that legal predicate, the DJA cannot expand the statute's authority by doing so.  Other courts have agreed: cases that reference both the DJA and any permutation of the

25

Recognition Act are few, and we have found none in which a court undertook to use the DJA to declare the unenforceability of a foreign judgment before the putative judgment-creditor could seek it.

One case where judgment-debtors asked a court to declare a foreign judgment unenforceable under the DJA is particularly instructive. In Basic v. Fitzroy Eng'g, Ltd., 949 F. Supp. 1333 (N.D. Ill. 1996), the court sua sponte instructed the plaintiff to pursue "an obvious alternative remedy that [was] not only a 'better' approach, but still allow[ed] [the putative judgment-debtor] to argue the same points to an American judge, albeit at a later date." Id. at 1341. That alternative, of course, was for the judgment-debtor to wait for the putative judgment-creditor to bring an enforcement action under the Illinois version of the Recognition Act, and then raise nonrecognition as an affirmative defense. Id.

Chevron attempts to redeem the novelty of its argument by arguing that its action is permitted under the Dow Jones test, which guides courts in issuing declaratory judgments. Dow Jones & Co. v. Harrods, Ltd., 346 F.3d 357, 359-60 (2d Cir. 2003). That test is of limited relevance in this case. Because the DJA cannot create legal rights that do not otherwise exist, no balancing test, no matter how its many factors are weighed, can lead us to establish such a right.

At any rate, once the issues under the Recognition Act are properly understood, it becomes clear that under the Dow Jones test the district court must be found to have abused its discretion in undertaking to issue a declaratory judgment. As discussed above,

the Recognition Act does not authorize a court to declare a foreign judgment null and void for all purposes in all countries, or to issue injunctions preventing parties to foreign litigation from acting abroad to present issues to foreign courts. The argument for a declaratory judgment, which thus becomes limited to the claim that Chevron can petition a New York court to declare in advance that any effort to enforce the Ecuadorian judgment *in New York,* must fail.

In <u>Dow Jones</u>, we noted that the primary issues in assessing the appropriateness of declaratory relief are "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." <u>Id</u>. at 359. We further noted with approval that other courts have elaborated on this standard by asking such questions as "(1) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; (2) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (3) whether there is a better or more effective remedy." <u>Id</u>. at 359-60.

To state these standards is to make apparent that Chevron's argument for declaratory relief must fail. The LAPs hold a judgment from an Ecuadorian court. They may seek to enforce that judgment in any country in the world where Chevron has assets. There is no indication that they will select New York as one of the jurisdictions in which they will undertake enforcement efforts, and if they do, they will have to present their claim to a New York court which will then apply the standards of the Recognition Act

27

before any adverse consequence may befall Chevron.  It is unclear what is to be gained by provoking a decision about the effect in New York of a foreign judgment that may never be presented in New York.  If such an advisory opinion were available, any losing party in litigation anywhere in the world with assets in New York could seek to litigate the validity of the foreign judgment in this jurisdiction.

Such a regime would unquestionably provoke extensive friction between legal systems by encouraging challenges to the legitimacy of foreign courts in cases in which the enforceability of the foreign judgment might otherwise never be presented in New York.  As Chevron's effort to secure injunctive relief illustrates, permitting such speculative declaratory relief would encourage efforts by parties to seek a res judicata advantage by litigating issues in New York in order to obtain advantage in connection with potential enforcement efforts in other countries.  And while the declaratory judgment might definitively settle the question of enforcement in New York – a question that in the ordinary course might never arise at all – it would hardly "finalize" the larger dispute between the parties about the legitimacy of the Ecuadorian judgment or its enforceability in other countries.  We thus agree with the court in <u>Basic</u>, 949 F. Supp. at 1341, that a far better remedy is available: Chevron can present its defense to the recognition and enforcement of the Ecuadorian judgment in New York if, as and when the LAPs seek to enforce their judgment in New York.

## CONCLUSION

We have considered all of the parties' remaining arguments on appeal and find them to be either rendered moot by our disposition of this appeal or to pertain to litigation that is not properly before us.[17]  Accordingly, for the foregoing reasons and consistent with our September 19, 2011 order, the judgment of the district court is REVERSED and

---

[17] Two of the defendants-appellants, Naranjo and Payaguaje, also challenge the district court's personal jurisdiction over them.  Ordinarily, we would address any challenge to personal jurisdiction prior to deciding the merits of the cause of action. See In re Rationis Enters., Inc. of Panama, 261 F.3d 264, 267-68 (2d Cir. 2001) (treating personal jurisdiction as a threshold determination that precedes adjudication of the merits).  However, in cases such as this one with multiple defendants – over some of whom the court indisputably has personal jurisdiction – in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants.  This is particularly true when the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development.  See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990) (discussing the changing nature of personal jurisdiction analysis, depending on the procedural posture of the case); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1067.6 (3d edition 2011) ("Alternatively, when the jurisdictional question is complex or difficult, a court simply may avoid the issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the question; that approach is possible even when the jurisdictional issue lacks complexity.").  This approach does not violate the Supreme Court's repudiation of the so-called "hypothetical jurisdiction" doctrine, Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998), as our analysis is based on the undisputed personal jurisdiction of the other defendants.  We therefore decline to address Naranjo and Payaguaje's personal-jurisdiction arguments, and express no views regarding the district court's related analysis. See Donziger, 768 F. Supp. 2d at 640-45.

Similarly, we express no views on the merits of the parties' various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation, which may be addressed as relevant in other litigation before the district court or elsewhere.

the preliminary injunction VACATED. We REMAND to the district court with the instruction to DISMISS Chevron's claim for injunctive and declaratory relief under the Recognition Act in its entirety.