**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| LORENE MURPHY, | ) | |
| | ) | |
| Plaintiff/Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEXA SPINOSO, STEVEN SPINOSO, LISA MORRA, and AUSTIN MURPHY, | ) ) ) | C.A. No. 2025-0075-CDW |
| | ) | |
| Defendants/Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARYLILL LLC, | ) | |
| | ) | |
| Nominal Respondent. | ) | |

## REPORT GRANTING MOTIONS TO DISMISS

Date Submitted: December 4, 2025
Date Decided: March 19, 2026

Joesph L. Christensen, CHRISTENSEN LAW LLC, Wilmington, Delaware; Maurice W. Heller, FOSTER GARVEY PC, New York, New York; Julia Doherty, FOSTER GARVEY PC, Seattle, Washington; Maggie Sholian, FOSTER GARVEY PC, Portland, Oregon; *Counsel for Plaintiff/Petitioner Lorene Murphy*

Todd A. Flubacher, Matthew R. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Defendants/Respondents Alexa Spinoso and Steven Spinoso and Nominal Respondent Marylill LLC*

Richard L. Renck, DUANE MORRIS LLP, Wilmington, Delaware; *Counsel for Defendant/Respondent Austin Murphy*

**WRIGHT, M.**

Several years ago, four heirs to a $100 million estate being probated in Florida could not agree on how to handle the estate's assets. Most of the estate's value was tied up in a Delaware limited liability company holding stock in three publicly traded companies. There would be significant tax liabilities if the LLC was immediately dissolved and its assets (the stock) distributed to the heirs before June 2026.

But the estate needed to borrow money to pay estate taxes in the short term and the heirs wanted to use some of the inherited assets during that holding period. So the heirs, assisted by counsel, negotiated a settlement that contemplated the LLC remaining in existence through at least June 2026, holding the member interests in four newly created subsidiary limited liability companies, each of which would hold one-fourth of the LLC's assets. The LLC and the subsidiary LLCs would remain under the control of the estate's personal representatives, but each heir would have some ability to direct the personal representatives' management of the assets. The parties agreed that Florida law would govern their agreement and that the Florida probate court would be the exclusive forum to adjudicate any disputes relating to the agreement. They also stipulated to and obtained an order from the Florida probate court signing off on key terms of the settlement.

After that, things did not go the way one heir expected. The estate's personal representatives denied her efforts to give them directions and refused to allow her to borrow from the subsidiary LLC's margin loan for her personal use. She asked the Florida probate court to make them do it, but the court denied the request. She then asked the Florida court to vacate the settlement agreement for lack of subject matter jurisdiction.

The heir also set her sights on Delaware. She advances several claims here, all of them designed to undo the settlement she negotiated and presented to the Florida probate court. First, she now contends that the LLC she agreed would continue until at least June 2026 actually dissolved as a matter of law in 2021 when the LLC's then-sole member died. Second, she seeks reformation of the subsidiary LLC's operating agreement, contending that by either unilateral or mutual mistake the agreement omits material terms the parties agreed to in their settlement. Third, she asserts a claim against the personal representatives for breaching their fiduciary duties as managers of the subsidiary LLC. The responding parties all moved to dismiss.

This report recommends that the motions to dismiss be granted. The heir's dissolution claim fails because she lacks standing to seek dissolution under Section 18-802 of the Delaware Limited Liability Company Act and she has failed to plead facts suggesting this is an exceptionally rare situation where

– 2 –

equity should intervene to aid a non-member and non-manager's request to have this court order the dissolution and winding up of a Delaware limited liability company. The heir's reformation claim fails because she has not come close to pleading the circumstances constituting the alleged mistake with the particularity Delaware law requires. Finally, the heir's fiduciary duty claim fails because personal representatives in their capacity as the managers of the subsidiary LLC do not owe fiduciary duties to the heir.

## I.    BACKGROUND

The facts necessary to my rulings are drawn from the Verified Amended Complaint for Declaratory Judgment and Injunctive Relief ("Amended Complaint")[1] and documents attached to or incorporated by reference in the Amended Complaint.[2] I also draw some facts from the Verified Petition for Dissolution ("Petition")[3] solely for purposes of explaining the parties' relationships to each other. Finally, I draw some facts from documents filed in

---

[1] Dkt. 17.

[2] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 874–75 (Del. 2020) (citing *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006)).

[3] Dkt. 1.

Florida litigation involving the parties for background purposes, but do not rely on the facts in those documents for the substance of my rulings.[4]

## A. The Parties

This litigation primarily concerns the administration of nominal respondent Marylill, LLC and one of its subsidiaries. Marylill is a Delaware limited liability company, formed by Edward Peter Zanchetta on June 3, 2021.[5] Marylill was formed for the purpose of holding and administering Zanchetta's assets late in his life.[6]

Plaintiff and petitioner Lorene Murphy ("Plaintiff") is Zanchetta's niece.[7] Near the end of Zanchetta's life, the Eleventh Judicial Circuit Court in Miami-Dade County, Florida ("Florida Court") appointed Plaintiff as the plenary guardian of Zanchetta's person and property.[8] In this capacity Plaintiff served dual roles as the manager of Marylill and acting on behalf of its sole member: Zanchetta.[9]

---

[4] *See generally NVR, Inc. v. Carter Farm, LLC*, 2026 WL 297226, at \*7–9 (Del. Ch. Feb. 4, 2026) (discussing when and for what purposes the court may take judicial notice of other court filings and records when considering a motion to dismiss) (collecting authorities).

[5] Am. Compl. ¶¶ 2–3, 9; 16–20; Am. Compl. Ex. 1 § 2.1.

[6] *See* Am. Compl. ¶¶ 16–25 (stating Marylill did not conduct business in Florida but held Zanchetta's funds).

[7] *Id.* ¶ 16; Pet. ¶ 3.

[8] Am. Compl. ¶¶ 18–20.

[9] *Id.* ¶¶ 18–25; *see* Am. Compl. Ex. 1 Scheds. A, C.

Defendant and respondent Alexa Spinoso is Plaintiff's sister, Zanchetta's niece, a co-personal representative of the Estate of Edward Peter Zanchetta ("Estate"), and a beneficiary of the Estate.[10] Defendant and respondent Steven Spinoso is Plaintiff's brother, Zanchetta's nephew, a co-personal representative of the Estate, and a beneficiary of the Estate.[11] Respondent Lisa Morra ("Morra") is Plaintiff's sister, Zanchetta's niece, and a beneficiary of the Estate.[12] Defendant Austin Murphy is Plaintiff's son, Zanchetta's grandnephew, and a co-personal representative of the Estate.[13] In this report I refer to Alexa Spinoso, Steven Spinoso, and Morra as "Respondents," to Alexa Spinoso and Steven Spinoso as "Moving Respondents,"[14] and to Alexa Spinoso, Steven Spinoso, and Austin Murphy as the "Co-PRs."

---

[10] Am. Compl. ¶ 12; Pet. ¶ 4.

[11] Am. Compl. ¶ 13; Pet. ¶ 5.

[12] Am. Compl. ¶ 14; Pet. ¶ 6; Tr. of 12-4-2025 Oral Arg. on Defs.'/Resp'ts' Mot. to Dismiss ("Tr.") at 5, Dkt. 49.

[13] Am. Compl. ¶¶ 15, 72.

[14] I distinguish between Respondents and Moving Respondents because Morra has not appeared or otherwise participated in this case. Plaintiff purports to have served the petition and summons on Morra on February 7, 2025 by serving non-party Zanchetta Investments, LLC through its registered agent Corporate Creations Networks Inc. *See* Dkt. 6. The docket does not reflect any response from Morra to the Petition, nor does it reflect Plaintiff seeking to default her or serving the Amended Complaint on her. Despite Morra's lack of participation, she ultimately benefits from Moving Respondents' efforts.

LAEC Investments, LLC ("LAEC") is a Delaware LLC and subsidiary of Marylill that holds 25% of Marylill's assets.[15] The Co-PRs are the managers of LAEC.[16]

## B. Plaintiff Forms Marylill on Zanchetta's Behalf

Zanchetta was the owner of Virda Netco Establishment, an entity formed under the laws of Liechtenstein.[17] Virda Netco held shares of three publicly traded companies.[18] On August 2, 2018, the Florida Court appointed Plaintiff as Zanchetta's plenary guardian of his person and property.[19]

On June 3, 2021, shortly before Zanchetta's passing, Plaintiff formed Marylill on his behalf.[20] In conjunction with Marylill's formation, Plaintiff executed the Marylill's Limited Liability Company Agreement ("Marylill Agreement").[21] Under the Marylill Agreement, Zanchetta was Marylill's sole member and Plaintiff was the sole manager.[22] On June 8, Plaintiff transferred

---

[15] Am. Compl. ¶ 10.

[16] *Id.* ¶¶ 10, 12–13, 15.

[17] *Id.* ¶ 16.

[18] *Id.* ¶ 17.

[19] *Id.* ¶ 18.

[20] *Id.* ¶ 19.

[21] *Id.* ¶ 21; Am. Compl. Ex. 1. (dated June 3, 2021).

[22] Am. Compl. ¶ 21; Am. Compl. Ex. 1 § 1.1(e).

Virda Netco's assets to Marylill as Zanchetta's initial capital contribution.[23] At this time, Marylill held approximately $93 million in assets.[24]

Zanchetta died intestate on June 21.[25] Zanchetta had no spouse or children, and his brother and parents predeceased him.[26] His only heirs are Plaintiff and Respondents.[27] Under Florida intestacy law, each of the four heirs is entitled to an equal share of the Estate.[28]

## B. The Co-PRs Begin Administering the Estate

On September 9, the Co-PRs filed a petition for administration in the Florida Court.[29] The Florida Court appointed the Co-PRs co-personal representatives of the Estate on November 15.[30] On December 17, Plaintiff filed a petition with the Florida Court to approve her final accounting of Zanchetta's assets, authorize her to distribute the assets to Zanchetta's heirs and

---

[23] Am. Compl. ¶ 20.

[24] *See id.* ¶ 20.

[25] *Id.* ¶¶ 24, 29.

[26] *Id.* ¶ 29.

[27] *Id.* ¶ 29.

[28] *See* Fla. Stat. Ann. § 732.104 (West) (stating intestate estates are distributed per stirpes); *Per Stirpes*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[29] Am. Compl. ¶ 30.

[30] *Id.* ¶ 33.

creditors, and discharge her as Zanchetta's guardian.[31]  On January 18, 2022, the Co-PRs filed an inventory of the Estate with the Florida Court.[32]  The Estate's assets listed in the inventory totaled $104,315,936.67, and included assets held by Marylill.[33]  Plaintiff alleges that the inventory simply listed Marylill's assets as those of the Estate and "was devoid of any mention of Marylill or Zanchetta's ownership interest in Marylill.[34]

## C.    The Parties Dispute How to Distribute the Estate's Assets

On February 17, the Florida Court entered an Order Approving Distribution, which directed Plaintiff to deliver and distribute Zanchetta's assets to the Co-PRs.[35]  Around this time, the four heirs began to debate how the Estate should be administered—the estate taxes being a significant subject.[36]  At some point before March 21, the Co-PRs determined that the Estate did not have enough cash to pay its federal taxes which were soon due.[37]  The Co-PRs

---

[31] *See* Opening Br. of Defs./Resp'ts Alexa Spinoso and Steven Spinoso, and Nominal Defendant Marylill LLC in Supp. of Their Mot. to Dismiss, Dkt. 36 ("Opening Br."), Exs. B–C.

[32] Am. Compl. ¶ 34.

[33] *Id.*

[34] *Id.*

[35] Opening Br. Ex. C.

[36] Am. Compl. ¶ 35.

[37] *See* Agreed Order on Emergency Pet. for Order Authorizing Personal Representatives to Sell Assets or Borrow Funds For Payment of Fed. Estate Taxes ("Agreed Order"), Am. Compl. Ex. 2 at 1.

filed an emergency petition in the Florida Court for an order allowing them to either sell the Estate's assets or borrow funds to pay the federal estate tax.[38] Morra filed a counterpetition.[39]

On March 21, the Florida Court held a hearing on the emergency petition. At the hearing, the parties came to an agreement to resolve the tax issue.[40] The Florida Court entered an order in line with the agreed terms.[41] The Co-PRs were directed borrow funds to pay the estate taxes.[42] The Co-PRs were also ordered to form four limited liability companies as subsidiaries of Marylill ("Sub LLCs"), each of them to be funded with one-fourth of Marylill's assets.[43] Each Sub LLC was allocated to one of Zanchetta's four heirs, but the member interest in each Sub LLC remained with Marylill.[44] Lastly, the Florida Court appointed the Co-PRs as the managers of the Sub LLCs, and granted each of the beneficiaries authority to direct the Co-PRs to engage in transactions "concerning the assets in the beneficiary's respective" Sub LLC.[45]

---

[38] *See* Agreed Order at 1.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* ¶ 2.

[43] *Id.* ¶ 4.

[44] *Id.* ¶ 5.

[45] *Id.* ¶¶ 3, 6.

**D.    The Co-PRs Form the Sub LLCs and Assume Control of Marylill**

On March 24, the Co-PRs formed the Sub LLCs: (1) ASJ Marylill Investments, LLC for Alexa Spinoso; (2) Fix-It Rite! Holdings, LLC for Steven Spinoso; (3) Zanchetta Investments, LLC for Morra; and (4) LAEC for Plaintiff.[46]  That same day, Plaintiff and the Co-PRs executed the Limited Liability Company Agreement of LAE Investments, LLC ("LAEC Agreement").[47]  The LAEC Agreement listed Marylill as its sole member[48] and vested the Co-PRs with joint management duties and powers.[49]  The LAEC Agreement directed the Co-PRs "to conduct the affairs of [LAEC] in the best interests of [LAEC] and of the Member[:]" Marylill.[50]

On April 4, the Co-PRs and Plaintiff executed a Written Consent of Manager and Sole Member of Marylill ("Written Consent") to formally name the Estate as the sole member and appoint the Co-PRs as the managers of

---

[46] Am. Compl. ¶ 39.  The pleadings do not identify when the Co-PRs filed the certificates of formation for the Sub LLCs, but publicly available information from the Delaware Division of Corporations indicates they did so on March 24, 2022.  *See* https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.  *Cf.* D.R.E. 201.

[47] *See* LAEC Agreement at Recitals.  LAEC was initially formed as LAE Investments, LLC but later changed its name to LAEC Investments, LLC.  *See* Am. Compl. ¶ 7.

[48] LAEC Agreement § 1.10; *id.* Exs. A–B (listing Marylill as the sole member).

[49] *Id.* §§ 5.1–5.3.

[50] *Id.* § 5.3.c.

Marylill.[51]  Plaintiff signed as the "Resigning Manager."[52]  After executing the Written Consent, the Co-PRs amended the Marylill Agreement to reflect the changes outlined in the Written Consent.[53]

On April 6, the Florida Court entered an order discharging Plaintiff as Zanchetta's plenary guardian.[54]  In doing so, the Florida Court found that Plaintiff "delivered [Zanchetta]'s assets to the person(s)/entity entitled" to receive them.[55]

### E.  The Parties Execute a Settlement Agreement Memorializing the In-Court Agreement

On May 16, all of the parties in this action executed a settlement agreement ("Settlement Agreement")[56] resolving their respective claims in the Florida Court probate proceedings and memorializing the terms of the Florida Court's March order.[57]

---

[51] Am. Compl. ¶ 45; Opening Br. Ex. E.  Plaintiff signed two days later, but the consent is backdated to April 4. *See* Opening Br. Ex. E at *2.

[52] Opening Br. Ex. E at *2.

[53] *See* Opening Br. Ex. F.

[54] Opening Br. Ex. G.

[55] Opening Br. Ex. G.

[56] Am. Compl. Ex. 4.

[57] Am. Compl. ¶ 48; *see* Settlement Agreement at 19–23.  Plaintiff executed the Settlement Agreement on May 16, but the Settlement Agreement is dated and signed by the Co-PRs and Mora on May 6.

The Settlement Agreement laid out how the Sub LLCs would be governed and each beneficiary's rights and authority related to their respective Sub LLC.[58]  The Settlement Agreement gave each beneficiary the title of "Investment Director" with the power to "direct [the Co-PRs], as the managers of the [Sub] LLC assigned to the Investment Director . . . to sell, borrow against, or enter into a securities backed line of credit[,]" among other transactions concerning that Sub LLC's assets.[59]  In addition, the Settlement Agreement required the Co-PRs to "otherwise administer such [Sub] LLC . . . without the need for further direction from the Investment Director[]."[60]

The Settlement Agreement also laid out how Marylill and the Sub LLCs would be liquidated and their assets distributed to the beneficiaries.[61]  The Co-PRs were barred from closing the Estate before June 3, 2026, without the four heirs' consent.[62]  Once the Estate was set to be closed, the Co-PRs would

---

[58] *See* Settlement Agreement ¶¶ 3–5.

[59] *Id.* ¶ 5.

[60] *Id.*

[61] *Id.* ¶¶ 10–13, 19.

[62] *Id.* ¶ 10.

distribute each Sub LLC's assets as outlined in Section 11[63] and each beneficiary's share of the Estate's taxes would be calculated under Section 12.[64]

Each of the parties to the Settlement Agreement acknowledged being represented by, or having the opportunity to consult with, independent legal counsel and tax advisors in connection with negotiating and executing the Settlement Agreement, and to making their "own economic analysis of [the Settlement] Agreement and [their] obligations thereunder, free of any advice or representations" of another settling party.[65] The parties also agreed the Florida Court would have exclusive jurisdiction "to enforce [the Settlement] Agreement and to determine any and all disputes arising under or related in any way to this Agreement," and that Florida law would govern any interpretation of the Settlement Agreement.[66]

---

[63] *Id. See id.* ¶ 11.

[64] *Id.* ¶ 12.

[65] *Id.* The parties were all represented by counsel. *See id.* ¶ 33. The parties also "acknowledge[d], represent[ed], and warrant[ed]" that they were not acting under "any duress or undue influence," that they had "read [the Settlement] Agreement and understood its terms," and that they "underst[ood] the consequences and legal effects of [the Settlement] Agreement[.]" *Id.* ¶ 31.

[66] *Id.* ¶¶ 22, 25.

After the parties executed the Settlement Agreement, they presented it to the Florida Court, which approved it on May 20, 2022, and entered it as an order of the Florida Court on May 21.[67]

## F. Plaintiff Re-Initiates Probate Proceedings to Revoke or Modify the Settlement Agreement

Things quieted down for a few months, but the underlying conflict between the parties reemerged. Plaintiff alleges that the Co-PRs—two of her siblings and her son—"abused their legally invalid positions as purported managers of Marylill and LAEC."[68] Plaintiff claims that the Co-PRs "deprived [her] of her ability to access and control the assets" in LAEC which she maintains "rightfully belong to her[.]"[69]

On August 23, 2023, Plaintiff filed a motion with the Florida Court to compel the Co-PRs "to follow [her] directions . . . as Investment Director and allow her to borrow from the margin loan for personal use."[70] The Florida Court denied Plaintiff's motion.[71]

---

[67] Opening Br. Exs. H–I; *see* Am. Compl. ¶ 54.

[68] Am. Compl. ¶ 54.

[69] *Id.*

[70] *Id.* ¶ 58.

[71] *Id.*

On May 24, 2024, Plaintiff filed a Motion to Vacate the Settlement Agreement ("Motion to Vacate") in the Florida Court.[72] In the Motion to Vacate, Plaintiff argued that the Florida Court lacked personal and subject matter jurisdiction over Marylill, and thus the Settlement Agreement was improper.[73] Plaintiff withdrew the Motion to Vacate sometime before briefing began on the motions to dismiss.[74]

Plaintiff maintains that the Co-PRs "have taken funds from Marylill's assets . . . but have deprived [her] from doing so."[75] Plaintiff asserts that the Co-PRs have each received over $400,000 from Marylill's assets, including to pay their personal attorneys' fees in the Florida probate proceedings.[76] Concurrently, Plaintiff alleges, the Co-PRs have blocked any distribution to her and declined to enter into a loan secured by LAEC assets, leaving her in a "dire financial situation . . . with barely enough [cash] to support herself."[77] Plaintiff

---

[72] *Id.* ¶ 61.

[73] *Id.* ¶¶ 60–61.

[74] *See* Opening Br. 14; Tr. 9, 52. Moving Respondents also say Plaintiff has filed "several requests with the" Florida Court "seeking early distributions of income generated by LAEC[.]" Opening Br. 14.

[75] Am. Compl. ¶ 67.

[76] *Id.* ¶¶ 67–68.

[77] *Id.* ¶¶ 69–70.

contends that this left her facing the threat of insolvency and prevented her from reentering the job market.[78]

## F. Plaintiff Files this Action

On January 23, 2025, Plaintiff filed the Petition.[79]  Plaintiff asserted two claims in the Petition.  Count I was a claim asking the court to declare that Marylill was dissolved 90 days after Zanchetta's death as a matter of law under Section 18-801 of the Delaware Limited Liability Company Act ("LLC Act")[80] and the Marylill Agreement, and order Marylill's winding up.[81]  Count II was a claim asking the court to dissolve Marylill under Section 18-802 of the LLC Act and appoint her liquidating trustee under Section 18-805.[82]

Moving Respondents moved to dismiss with an accompanying opening brief on February 6.[83]  On April 30, Plaintiff amended the Petition by filing her Verified Amended Complaint for Declaratory Judgment and Injunctive Relief, or in the Alternative, Petition for Dissolution.  She added Austin Murphy as a defendant and added claims for reformation of the LAEC Agreement under the

---

[78] *Id.* ¶¶ 72–73.

[79] *See* Pet.

[80] 6 *Del. C.* §§ 18-101–18-1208.

[81] Pet. ¶ 46; *see also* Am. Compl. ¶¶ 75–85 (Count I).

[82] Pet. ¶ 54; *see also* Am. Compl. ¶¶ 96–102 (Count III).

[83] Dkt. 8.  Austin Murphy was not a party to these proceedings until Plaintiff filed the Amended Complaint.  *See* Dkt. 23.

doctrines of unilateral and mutual mistake and for breaches of fiduciary duty against the Co-PRs.[84] The Co-PRs moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6).[85]

On May 22, Plaintiff filed a Motion for a Temporary Restraining Order ("TRO Motion") together with an opening brief and a Motion for Expedited Proceedings.[86] The TRO Motion largely recycled Plaintiff's allegations about her financial situation.[87] After filing the TRO Motion, Plaintiff took no action on it, leading the court to issue a minute order on July 1.[88] Moving Respondents opposed the TRO Motion on July 18 and Austin Murphy filed a joinder the next day.[89] Plaintiff filed her reply on August 1.[90]

On August 7, Moving Respondents filed their Opening Brief in Support of the Motion to Dismiss and Austin Murphy filed his joinder.[91] On September 4, the court denied the TRO Motion and the motion to expedite.[92] Plaintiff filed

---

[84] Am. Compl. ¶¶ 86–95 (Count II), 103–110 (Count IV).

[85] Resp'ts' Mot. to Dismiss, Dkt 18; Def.-Resp't Austin Murphy's Mot. to Dismiss, Dkt. 26. Austin Murphy joined Respondents' Opening Brief and Reply Brief. Dkts. 37, 45.

[86] Dkts. 21–22.

[87] Dkt. 22 at 11–14. *Compare id.*, *with* Am. Compl. ¶¶ 49–74.

[88] Dkt. 24.

[89] Dkts. 27, 29.

[90] *See* Opening Br.

[91] Dkts. 36–37.

[92] Dkts. 39–40.

her Brief in Opposition to Defendants'/Respondents' Motion to Dismiss.[93] Moving Respondents filed their Reply Brief in Further Support of the Motion to Dismiss on September 23.[94] On December 5, the court heard argument on the Motion to Dismiss and took the matter under advisement.[95]

## II.    ANALYSIS

Moving Respondents, joined by Austin Murphy, seek dismissal of the Amended Complaint under Court of Chancery Rule 12(b)(6).[96] First, they attack Counts I and III of the Amended Complaint by arguing that those claims must be dismissed because Plaintiff lacks standing to seek an order directing the dissolution of Marylill.[97] Second, they attack Counts II and IV, respectively, by arguing that Plaintiff has failed to adequately plead claims for reformation and breach of fiduciary duty.[98] Third, they argue Plaintiff's claims are barred by the doctrines of acquiescence, estoppel, and laches.[99] Fourth,

---

[93] Br. in Opp'n to Defs.'/Resp'ts' Mots. to Dismiss the Verified Am. Compl., Dkt. 41 ("Answering Br.").

[94] Reply Br. in Further Support of the Mot. to Dismiss of Defs.-Resp'ts Alexa Spinoso and Steven Spinoso, and Nominal Resp't Marylill LLC, Dkt. 43 ("Reply Br."). Austin Murphy filed his joinder the next day. Dkt. 45.

[95] Dkt. 48.

[96] Resp'ts' Mot. to Dismiss, Dkt 18; Def.-Resp't Austin Murphy's Mot. to Dismiss, Dkt. 26.

[97] Opening Br. 19–30 (Argument I).

[98] *Id.* at 31–37 (Arguments II–III),  46–48 (Arguments VI–VII).

[99] *Id.* at 38–44 (Argument IV).

they argue dismissal is appropriate because the Florida probate court has jurisdiction over the Estate's interest in Marylill because the interest is personal property subject to probate in Florida, the state where Zanchetta died.[100] Finally, they argue Plaintiff has not established grounds to appoint a trustee and does not have a right to an accounting.[101]

When reviewing a motion to dismiss under Rule 12(b)(6), Delaware courts "(1) accept all well pleaded factual allegations as true[;] (2) accept even vague allegations as 'well-pleaded' if they give the opposing party notice of the claim; [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ." *Fitzgerald v. Fitzgerald Home Farm, LLC*, 2024 WL 1071970, at *2 (Del. Ch. Mar. 12, 2024).[102] The court need not accept conclusory allegations unsupported by specific facts, nor draw unreasonable inferences in a plaintiff's favor. *E.g.*, *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 319 (Del. Ch. 2022).[103] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg. Co.*, 27 A.3d at 537. Delaware courts must "deny the motion unless the plaintiff[(s)] could not recover under any reasonably conceivable set of circumstances." *Id.* at 536.

---

[100] *Id.* at 45 (Argument V).

[101] *Id.* at 46–48 (Arguments VI–VII).

[102] Citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[103] Citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

The rest of this section analyzes arguments raised by Moving Respondents in support of dismissal. First, the court addresses the argument that Plaintiff lacks standing to seek judicial dissolution (Counts I and III). Second, the court addresses the argument that Plaintiff failed to plead proper claims for reformation and breach of fiduciary duty. Because my resolution of these arguments is sufficient to dispose of all claims asserted in the Amended Complaint, this report does not consider Moving Respondents' other arguments for dismissal.

**A.      Counts I and III Should Be Dismissed Because Plaintiff Lacks Standing to Seek Dissolution Under Section 18-802 and Has Not Stated a Claim for Equitable Dissolution**

Moving Respondents offer five reasons why the court should dismiss Counts I and III: (1) Plaintiff lacks standing to seek judicial dissolution of Marylill because she is neither a member nor a manager of Marylill; (2) Marylill did not suffer a dissolution event because Zanchetta's death did not leave Marylill without a member; (3) even if Zanchetta's death was a dissolution event, the Co-PRs properly continued Marylill's existence for purposes of settling Zanchetta's estate; (4) alternatively, even if Zanchetta's death was a dissolution event, the Co-PRs properly revoked the dissolution; and

(5) Plaintiff has failed to allege viable grounds for dissolution as a matter of law.[104]

Moving Respondents contend that because Plaintiff is not a member or a manager of Marylill, she lacks standing to petition for judicial dissolution under Section 18-802 of the LLC Act.[105] Plaintiff counters that Moving Respondents apply the wrong standard. She says that she is not seeking to dissolve Marylill under Section 18-802, but is instead asking the court to declare Marylill was dissolved as a matter of law under Section 18-801 after Zanchetta's death in 2021.[106] Plaintiff says she only needs to show she has standing to seek a declaratory judgment, instead of standing to seek judicial dissolution, and that she has standing because she has a "protectible interest[:]" "her unquestioned right to 25% of Marylill if her position that Marylill dissolved is correct."[107] Moving Respondents insist this distinction is immaterial because Delaware's

---

[104] *See* Opening Br. 19–30; Reply Br. 8–16.

[105] Opening Br. 20–21.

[106] Answering Br. 23–26.

[107] *Id.* 23–24. This statement is false. Without the Settlement Agreement and Agreed Order, each heir is only entitled to 25% of the Estate. *See* Am. Compl. ¶ 29. With the Settlement Agreement and Agreed Order, each heir will receive—*through the Estate*—the member interest in a Sub LLC and 25% of any other assets of the Estate. *See* Settlement Agreement ¶ 11. Plaintiff even "agree[d] and acknowledge[d]" that the value of what she receives may "differ significantly" from what her siblings will receive. *Id.* Far from having an "unquestioned right," Plaintiff has never been entitled to "25% of Marylill."

– 21 –

declaratory judgment statute[108] cannot be "an end-run around Section 18-802" of the LLC Act, and, therefore, Plaintiff must still establish standing under Section 18-802.[109] Moving Respondents are correct Counts I and III should be dismissed, but not only because of Section 18-802.

"'Standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance." *Albence v. Higgen*, 295 A.3d 1065, 1085 (Del. 2022).[110] "'Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers.'" *Riverfront Hotel LLC v. Bd. of Adjustment of City of Wilm.*, 2019 WL 3884031, at * 1 (Del. July 11, 2019).[111] This issue is confined solely to "the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter in controversy." *Dover Hist. Soc.*, 838 A.2d at 1110.[112] "The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing." *Id.* at 1110.

---

[108] 10 *Del. C.* §§ 6501–6513 ("Declaratory Judgment Act").

[109] Tr. 21.

[110] Citing *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[111] Quoting *Dover Hist. Soc.*, 838 A.2d at 1111.

[112] Quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

Standing may be established by statutory language. *See Albence*, 295 A.3d at 1086. Under Section 18-802 the court may declare an LLC dissolved "[o]n application by a member or manager . . . of a limited liability company[.]" 6 *Del. C.* § 18-802. "By its terms, this language limits the right to seek statutory dissolution under Section 18–802 to members and managers of an LLC." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 597 (Del. Ch. 2015). Both sides agree Plaintiff is neither a member nor manager of Marylill,[113] so Plaintiff does not have statutory standing. *Id.*

But Section 18-802 is not the only method through which someone might have standing to seek a judicial declaration that an LLC has been or should be dissolved. As this court explained in *In re Carlisle*, equitable dissolution remains an available remedy even after the adoption of the LLC Act: "[T]his Court, as a court of equity, has the power to order the dissolution of a solvent company and appoint a receiver to administer the winding up of [its] assets." 114 A.3d at 601.[114] But this power is rarely deployed, and when someone who is not a member or manager of a Delaware limited liability company asks this court to use its equitable power to compel the dissolution and winding up of the entity, they must plead "a set of reasonably conceivable facts 'where it appears

[113] Am. Compl. ¶¶ 45, 50, 54, 58, 63, 95 (alleging Plaintiff "*was* manager of Marylill")

[114] Quoting *Weir v. JMACK, Inc.*, 2008 WL 4379592, at *2 (Del. Ch. Sept. 23, 2008).

manifest' that equity must intervene[.]"  *SolarReserve CSP Hldgs., LLC v. Tonopah Solar Energy, LLC*, 2020 WL 1291638, at *6 (Del. Ch. Mar. 18, 2020).[115]  As the *SolarReserve* court explained:

> Where, as here, a petitioner seeks *equitable* dissolution outside of the grounds enumerated in the Act, such as where a non-member/non-manager seeks dissolution, that petitioner must "explain" in a "convincing manner" why this court should "invoke equitable principles to override the plain language" of the Act and the relevant LLC agreement.

*Id.* at *5.  *See also Trusa v. Nepo*, 2017 WL 1379594, at *8 (Del. Ch. Apr. 13, 2017) ("Given its extreme nature . . . equitable dissolution is a remedy that should be granted sparingly.").[116]

---

[115] This opinion was vacated after the defendant filed for bankruptcy and the parties stipulated to a plan of reorganization.  *See* 2021 WL 3739128 (Del. Ch. Aug. 20, 2021).  The court recently quoted *SolarReserve* to describe the high burden needed to state a claim for equitable dissolution.  *See Keynetics Inc. v. Keynetics S'holder Tr.*, 331 A.3d 202, 217 (Del. Ch. 2025).

[116] Plaintiff did not plead a cause of action for equitable dissolution in her Amended Complaint, but that does not foreclose me from considering if the Amended Complaint states a claim for equitable dissolution because this court has held that equitable dissolution is a remedy, not a cause of action.  *See In re Shaw & Elting LLC*, 2015 WL 4874733, at *33 (Del. Ch. Aug. 13, 2015) ("[A] petitioner must prove an underlying claim to obtain the remedy of equitable dissolution.") (citing *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *5–6 (Del. Ch. Apr. 28, 2014)).  Some of the relief sought in the Amended Complaint relating to Marylill's dissolution would require the court to act in equity because Plaintiff lacks standing under the LLC Act to seek that relief.  *Compare* Am. Compl. Prayer for Relief ¶ 6 (requesting an order directing the winding up and liquidation of Marylill), *with* 6 *Del. C.* § 18-803(a) (stating, "the Court of Chancery, upon cause shown, may wind up the limited liability company's affairs upon application of any member or manager, or the member's personal representative or assignee").

– 24 –

The court has been unable to find any case in which the court has held that someone who stands in relation to a Delaware limited liability company the way that Plaintiff does to Marylill has made the required "manifest" showing even on a motion to dismiss. Plaintiff's relationships to Marylill are indirect. She is Marylill's former manager;[117] a beneficiary of the Estate, which holds the member interest in Marylill and is subject to probate in the Florida;[118] and she has a future interest in one of Marylill's assets, its member interest in LAEC, which is expected to be distributed to her in connection with the closing of the Estate.[119] She also, importantly, stands in relation to Marylill as someone who, through counsel, negotiated, signed, and presented to the Florida Court a settlement that explicitly contemplates Marylill's continued existence through at least June 2026 and until further order of that Florida Court.[120] These facts do not create a reasonably conceivable set of circumstances where equity

---

[117] Am. Compl. ¶ 21.

[118] *See* Am. Compl. ¶ 29; Settlement Agreement ¶ B(6).

[119] *See* Settlement Agreement ¶¶ 10–11.

[120] *See id.* ¶ 10 ("Between June 4, 2026, and July 2, 2026, or within 30 days of obtaining the consent to close the Estate . . . the Personal Representatives shall petition the Court for authorization to liquidate Marylill and distribute the interests of the Sub LLCs to the Estate and then distribute the interests in the Sub LLCs[.]"); Agreed Order ¶ 5 ("[A]ll Subsidiary Accounts shall remain a subsidiary of Marylill, LLC until further order of this Court.").

should intervene to let Plaintiff seek a judgment from this court that would undo everything that she, her siblings, and her son carefully negotiated.[121]

Given the availability of equitable dissolution, when properly asserted in a pleading, to provide standing to a proper party who is neither a member nor a manager of an LLC and thus cannot seek dissolution under Section 18-802, I do not believe that the Declaratory Judgment Act[122] offers a third method by which someone can seek such relief from this court. The Declaratory Judgment Act "'merely provides a procedural means for securing judicial relief in an expeditious and comprehensive manner' before traditional justiciability principles might permit." *DBMP LLC v. Delaware Claims Processing Facility, LLC*, 349 A.3d 663, 679 (Del. Ch. 2025).[123] It pulls forward in time an existing cause of action before a court might otherwise be able to hear it. It does not create a cause of action where one does not already exist. *Jordan v. Mirra*, 2017 WL 4070646, at *19 (D. Del. Sept. 14, 2017).[124] So the Declaratory

---

[121] *See SolarReserve*, 2020 WL 1291638, at *7 ("[B]y virtue of its own choices, and as recognized by all of the entity's constituents, SolarReserve's '*real relationship*' to Tonopah is that of a remote, indirect investor, not a member . . . . If I were to allow SolarReserve to seek Tonopah's dissolution, I would not be 'upholding' rights, I would be creating new ones SolarReserve did not bargain for or reasonably expect.").

[122] 6 *Del. C.* §§ 6501–6513.

[123] Citing *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1133, 1136 (Del. Super. 1992).

[124] As the *Jordan* court explained, "[l]ike a preliminary injunction, a declaratory judgment relies on a valid legal predicate. The [Declaratory Judgment Act] is procedural only, and does not create an independent cause of action." 2017 WL

Judgment Act, by itself, cannot confer standing on Plaintiff here to seek the remedy of equitable dissolution.

* * *

Having concluded that Plaintiff's dissolution claims (Counts I and III) should be dismissed because she lacks standing to seek dissolution under Section 18-802 of the LLC Act and she failed to state a claim for equitable dissolution, I do not reach Moving Respondents' alternative arguments that (1) Marylill did not suffer a dissolution event because Zanchetta's death did not leave Marylill without a member and (2) even if Zanchetta's death was a dissolution event, the Co-PRs properly continued Marylill's existence for purposes of settling the Estate or properly revoked the dissolution. I also do not reach Moving Respondents' arguments that Plaintiff's dissolution claims are also barred by the doctrines of acquiescence, estoppel, and laches.

**B.    Count II Should Be Dismissed Because Plaintiff Has Failed to Plead Her Reformation Claim With the Requisite Particularity**

In Count II, Plaintiff asserts a claim for reformation of the LAEC Agreement. Plaintiff alleges that when the Co-PRs drafted the LAEC Agreement, she believed that "her role as Investment Director would be

---

4070646, at *19 (construing the federal Declaratory Judgment Act and quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244–45 (2d Cir. 2012)).

included" in the contract.[125] She maintains that excluding this language "did not reflect the mutual agreement" between her and the Co-PRs and "deviates materially from the [Settlement Agreement's]. . . negotiated terms[.]"[126] Plaintiff concludes that reformation is necessary to correct the error.[127]

Moving Respondents contend that these allegations are insufficient to plead a claim for reformation.[128] Alternatively, even if the claim is well-pleaded, Moving Respondents maintain that Plaintiff could not succeed on her claim if allowed to proceed.[129] Plaintiff insists the opposite is true.[130] Moving Respondents are correct.

"The Court of Chancery has the power 'to reform a contract in order to express the 'real agreement' of the parties involved.'" *ASB Allegiance Real Est. Fund* v. *Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *12 (Del. Ch. May 16, 2012).[131] "'In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'"

---

[125] Am. Compl. ¶ 90.

[126] *Id.* ¶¶ 91, 93.

[127] *Id.* ¶ 94.

[128] Opening Br. 32–34; Reply Br. 19–21.

[129] Opening Br. 31–32.

[130] Answering Br. 33–37.

[131] Quoting C*erberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002).

*AECOM v. SCCI Nat'l Hldgs., Inc.*, 2023 WL 6294985, at *6 (Del. Ch. Sep. 27, 2023).[132]

> To survive a motion to dismiss under Rule 12(b)(6), the party seeking reformation based on mistake must allege with particularity: (i) that the parties reached a definite agreement before executing the final contract; (ii) that the final contract failed to incorporate the terms of the agreement; (iii) that the parties were similarly mistaken or that one knew of another's mistake and remained silent; and (iv) the precise mistake the parties made.

*Id.* (internal quotations and citations omitted). Each element must be pleaded with particularity; "failure to [plead] one requirement is fatal to the claim." *Id.*[133]

"In order for a court of equity to reform a contract in writing," a plaintiff must allege that the parties had "a complete mutual understanding of all the essential terms of their bargain, for otherwise there would be no standard by which the writing could be reformed." *Colvocoresses v. W.S. Wasserman Co.*, 4 A.2d 800, 803 (Del. Ch. 1939). "[T]he requirement to plead the actual agreement between the parties elucidates the specific correction the [c]ourt must make to their written agreement." *AECOM*, 2023 WL 6294985, at *6.

---

[132] Quoting *JJS, Ltd. v. Steelpoint CP Hldgs.*, 2019 WL 5092896, at *9 (Del. Ch. Oct. 11, 2019). *See also* Ct. Ch. R. 9(b).

[133] Citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1153 (Del. 2002) and *Interim Healthcare v. Sherion Corp.*, 2003 WL 22902879, at *8 (Del. Ch. Nov. 19, 2003).

"Regardless of whether a party pleads reformation for mutual mistake or unilateral mistake plus knowing silence, the party must establish 'that the parties came to a specific prior understanding.'" *Id.*[134] "Allegations about a party's 'general understanding' [are] insufficient." *Cf. In re Jeremey Paradise Dynasty Tr.*, 2023 WL 1241903, at *11 (Del. Ch. Jan. 31, 2023) (citation omitted) (articulating the standard after a trial on the merits).

For a claim to be pleaded with "particularity" it must "allege the circumstances [of the mistake] with detail sufficient to apprise the defendant of the basis for the claim." *Elburn ex rel. Invs. Bancorp, Inc. v. Albanese*, 2020 WL 1929169, at *3 (Del. Ch. Apr. 21, 2020).[135] This court has held that alleging "(1) the time, place, and contents of the [mistake]; (2) the identity of the person [with the mistaken belief]; and (3) what the [other party] intended to gain by" staying silent will satisfy this test. *Id.* at *8. A plaintiff need not allege evidentiary details. *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *12 (Del. Ch. Feb. 28, 2020).[136]

---

[134] Quoting *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *13 (Del. Ch. May 16, 2012).

[135] Quoting *LVI Gp. Invs., LLC v. NCM Gp. Hldgs. LLC*, 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2017).

[136] Quoting *Cont'l Illinois Nat. Bank & Tr. Co. of Chicago v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *6 (Del. Ch. Feb. 27, 1987).

The Amended Complaint does not meet this standard. There are no allegations that the Co-PRs knew or had reason to know that Plaintiff, represented by counsel, held a mistaken belief and stayed silent. There are no claims that the Co-PRs believed the Investment Director position would be in the LAEC Agreement when they negotiated the settlement or executed the LAEC Agreement. The exhibits Plaintiff presents to support her assertions do not require the "Investment Director" position to be included in any of the Sub LLC's operating agreements. In fact, they do not mention *any* LLC agreement.[137] Plaintiff only states, in conclusory fashion, that the LAEC agreement was "intended to be" what she says it is.[138] That is insufficient. I recommend that Count II be dismissed.[139]

---

[137] *See generally* Am. Compl. Exs. 2, 4. Plaintiff alleges that the Co-PRs "agreed to" the terms that Plaintiff "was the beneficiary of LAEC and is supposed to be authorized to direct how its funds are managed." Am. Compl. ¶ 88. Those terms are in the settlement. It is unclear to the court why it must incorporate terms the Co-PRs are already bound by into a separate contract.

[138] *E.g.*, Am. Compl. ¶ 51.

[139] As with Counts I and III, I do not reach Moving Respondents' argument that Plaintiff's reformation claim is also barred by the doctrines of acquiescence, estoppel, and laches.

## C. Court IV Should Be Dismissed Because the Co-PRs Do Not Owe Fiduciary Duties to Plaintiff as LAEC's Managers

Count IV is a claim against the Co-PRs for breaches of fiduciary duty in their capacities as managers of LAEC.[140] Plaintiff alleges that the Co-PRs breached their fiduciary duties by (1) failing to operate LAEC for its purpose; (2) failing to amend the LAEC Agreement to include her Investment Director position; (3) expending LAEC's assets for the Co-PRs' legal fees; and (4) for "ignoring [Plaintiff's] direction as Investment Director."[141]

To succeed on a claim for breach of fiduciary duty, Plaintiff must prove by a preponderance of the evidence that "(i) a fiduciary duty exists; and (ii) that a fiduciary breached that duty." *E.g.*, *Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264, 1272 n.25 (Del. Ch. 2024). The Co-PRs maintain that Count IV fails because they do not owe Plaintiff fiduciary duties as managers of LAEC. The Co-PRs reach this conclusion for two reasons. First, they assert that the managers of LAEC only owe fiduciary duties to LAEC itself, its members and other managers, and persons bound by the LAEC Agreement.[142] Plaintiff is none of these, thus, the Co-PRs reason no fiduciary relationship exists.[143]

---

[140] Am. Compl. ¶ 104 ("As managers of LAEC, the [the Co-PRs] owed LAEC and Ms. Murphy as its sole beneficiary and Investment Director, fiduciary duties.")

[141] *Id.* ¶¶ 105–09.

[142] Opening Br. 35; Reply Br. 22.

[143] Opening Br. 35.

Second, the Co-PRs contend that Plaintiff's role of Investment Director stems from a contractual relationship—not a fiduciary one—and is a superfluous recasting of Count II.[144]

"As a general proposition under Delaware law, only certain legal relationships will give rise to fiduciary duties among the parties involved." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1058 (Del. Super. 2001). "'Fiduciary duties [traditionally] arise from the separation of ownership and control. The essential quality of a fiduciary is that [they] control[] something [they] do[] not own.'" *Witmer v. Armistice Cap., LLC*, 344 A.3d 632, 655 (Del. Ch. 2025).[145] "Duties of a fiduciary character will only be imposed where the relationship or trust can be characterized as special; fiduciary duties will not be imposed in the midst of typical arms-length business relationships." *Total Care Physicians*, 798 A.2d at 1058.[146] Thus "[f]iduciary relationships usu[ally] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first[;] (2) when one person assumes control and responsibility over another[;] (3) when one person has a duty to act for or

---

[144] *Id.* at 35–36; Reply Br. 24–25.

[145] Quoting *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *40 (Del. Ch. May 6, 2021).

[146] Citing *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604–05 (Del. Ch. 1987).

give advice to another on matters falling within the scope of the relationship[;] or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *Witmer*, 344 A.3d at 656 n.181.[147] Fiduciary duties may also be imposed by contract. *See, e.g.*, *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *22 (Del. Ch. Mar. 13, 2000).[148]

### 1. The Co-PRs as LAEC's Managers Do Not Have Fiduciary Duties to the Estate's Beneficiaries

"The LLC Act provides that the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement 'may be expanded or restricted or eliminated by provisions in the limited liability company agreement.'" *Zimmerman*, 62 A.3d at 702 (quoting 6 *Del. C.* § 18-1101(c)). "To determine what fiduciary duties are owed in the limited liability company context, the Court must review the company's operating agreement." *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp.*, 2014 WL 4374261, at *12 (Del. Ch. Sep. 4, 2014).

---

[147] Quoting *Fiduciary Relationship*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[148] *See also Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160 (Del. 2002) (limited partnership agreements); *Zimmerman v. Crothall*, 62 A.3d 676 (Del. Ch. 2013) (LLC agreements).

Section 5 outlines the Co-PR's duties as managers.[149] The Co-PR's, collectively as a committee operating by majority vote, act as the "Manager" of LAEC.[150] Subsection 3 states:

> The Manager shall be under a fiduciary duty to conduct the affairs of [LAEC] in the best interest of [LAEC] and of the Member(s), including the safekeeping and use of all of the Property and the use thereof for the exclusive benefit of [LAEC].[151]
>
> The Manager shall have the fiduciary responsibility for the safekeeping and use of all funds and assets of [LAEC], whether or not in its immediate possession or control. The funds of [LAEC] shall not be comingled with the funds of any other person, and the Manager shall not employ, or permit any other person to utilize such funds in any manner, except for the benefit of [LAEC]. The bank accounts of [LAEC] shall be maintained at such bank and institutions as determined by the Manager, and withdrawals shall be made only in the regular course of LAEC's business, unless otherwise authorized by [the LAEC] Agreement and under such signature or signatures as the Manager may determine.[152]

Plaintiff argues the "existence of a fiduciary relationship in the LLC context does not depend on a [sic] contact."[153] She maintains that her status as "the

---

[149] *See* Am. Compl. Ex. 3 § 5.

[150] *Id.* § 5.1

[151] *Id.* § 5.3.c. The "Property" is any real and personal property held by LAEC. *Id.* § 1.10.

[152] *Id.* § 5.3.d.

[153] Answering Br. 37–38.

undisputed sole beneficiary of LAEC" establishes such a relationship.[154]

Plaintiff's contentions arise solely from conclusory allegations.

The sole "Member" of LAEC is Marylill.[155] The plain language of the LAEC Agreement is unambiguous. The Co-PRs, as the "Manager," owe fiduciary duties to LAEC and Marylill—not to Plaintiff nor any other beneficiary of the Estate. Further, the term "beneficiary" appears nowhere in the LAEC Agreement and it does not direct the Co-PRs to manage LAEC for Plaintiff's benefit.[156]

Plaintiff's reliance on the language in Section 18-1101(c) of the LLC Act does not salvage her claim. She asserts that the Co-PR's argument "contravenes the plain text of the LLC Act"[157] and a fiduciary relationship can be inferred from the nature of LAEC.[158] Tellingly, Plaintiff omits the key statutory language. A member or manager may owe fiduciary duties "to another person that is *a party to or is otherwise bound by a limited liability*

---

[154] *Id.* 38.

[155] *See* Am. Compl. Ex. 3 § 2.1 (listing Marylill as the holder of 100% of LAEC's membership interest).

[156] The word "beneficiary" is used in paragraph 4 of the Settlement Agreement, but the Settlement Agreement, like the LAEC Agreement, does not direct the Co-PRs to manage LAEC for Plaintiff's benefit, nor is there anything in the text of the Settlement Agreement suggesting that the use of "beneficiary" in paragraph 4 was intended to create a separate fiduciary relationship between Plaintiff and the Co-PRs.

[157] Answering Br. 39.

[158] *Id.* at 37.

*company agreement*."[159]  Plaintiff is neither a party to nor bound by the LAEC Agreement.  The Co-PRs do not owe Plaintiff fiduciary duties as managers of LAEC.

### 2. The Settlement Agreement Does Not Create Any Fiduciary Relationships

Next, Plaintiff alleges that the Settlement Agreement requiring LAEC's formation "established both a special trust and reliance" between Plaintiff and the Co-PRs.[160]  Plaintiff intuits this "special trust" exists because the LAEC Agreement states that LAEC's purpose "is to engage in the business of investment management" which encompasses "the fiduciary duties mandated by the" Settlement Agreement.[161]  She infers that the "best interests of" LAEC are stated in the Settlement Agreement, so the Settlement Agreement confers fiduciary duties on the Co-PRs. The Co-PRs contend that Plaintiff's right to direct investments is governed by the Settlement Agreement—a contract that is wholly independent of the LAEC Agreement—which did not impose any fiduciary duties.  The Co-PRs are correct.

Delaware courts interpret clear and unambiguous terms according to their ordinary meaning and "do not consider extrinsic evidence unless [they] find

---

[159] 6 *Del. C.* § 18-1101(c) (emphasis added).

[160] Answering Br. 38.

[161] Answering Br. 41.  Plaintiff also cites the Agreed Order, but the Settlement Agreement is incorporated into that order.

– 37 –

that the text is ambiguous." *Cox Commc'ns*, 273 A.3d 273 A.3d 752, 760 (Del. 2022). The Settlement Agreement's terms are clear and unambiguous. The Settlement Agreement requires the Co-PRs to form the Sub LLCs.[162] The Settlement Agreement appoints the Co-PRs as managers of the Sub LLCs.[163] The Settlement Agreement creates a position of "Investment Director" and outlines the powers of the role.[164] The Settlement Agreement does not "set forth specific fiduciary duties," nor does it "require those duties to be implemented through LAEC."[165] There is no language in the Settlement Agreement that "spells out" what are LAEC's "best interests."[166] The phrase does not appear anywhere in the Settlement Agreement.

I conclude that the plain language of the LAEC Agreement and Settlement Agreement do not impose any fiduciary obligations on the Co-PRs to Plaintiff. Therefore, it is not reasonably conceivable Plaintiff will succeed on her claim because the Amended Complaint does adequately demonstrate the existence of a fiduciary relationship. I recommend Count IV be dismissed.[167]

---

[162] Am. Compl. Ex. 4 § 4.

[163] *Id.*

[164] *Id.* §§ 4–5.

[165] Answering Br. 40.

[166] *Id.*

[167] As with Counts I–III, I do not reach Moving Respondents' argument that Plaintiff's fiduciary duty claim is also barred by the doctrines of acquiescence, estoppel, and laches.

## IV    CONCLUSION

For the reasons explained above, I recommend that the court dismiss the Amended Complaint in its entirety.  This is a Final Report under Court of Chancery Rule 144(b)(2).  Under Court of Chancery Rule 144(d)(2), any party who wishes to file exceptions to this report must file their notice of exceptions by March 30, 2026.